# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LYNN BRANDHORST, Derivatively on Behalf
of Nominal Defendant MALLINCKRODT PLC
93 Broadway
Los Gatos CA 95030



Plaintiff,


v.

MARK TRUDEAU
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

MATTHEW K. HARBAUGH
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

HUGH O'NEILL
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

ANGUS RUSSELL
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

DAVID CARLUCCI
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

J. MARTIN CARROLL
3 Lotus Park

Case No. _____

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS**


**<u>JURY TRIAL DEMANDED</u>**

1

The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

DAVID NORTON
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

JOANN REED
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

and

KNEELAND YOUNGBLOOD
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

                              Defendants,

and

MALLINCKRODT PLC
3 Lotus Park
The Causeway
Staines-Upon-Thames TW18 3AG
United Kingdom

                              Nominal Defendant.

Plaintiff Lynn Brandhorst, by and through his undersigned counsel, bring this shareholder

derivative action for the benefit of Nominal Defendant, Mallinckrodt plc ("Mallinckrodt")

against certain current and former officers and members of the Company's board of directors

(the "Board") seeking to remedy Defendants' (defined below) violations of §10(b) and/or 20(a)

of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, as well as breach of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Mallinckrodt and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Mallinckrodt's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Shenk vs. Mallinckrodt plc, et al*., No. 1:17-cv-00145-DLF (the "Securities Class Action"); and (e) review of other publicly-available information concerning Mallinckrodt and the Defendants.

## I.     INTRODUCTION

1.     Mallinckrodt is a specialty pharmaceutical company that, during the Relevant Period, developed, manufactured and distributed branded and generic pharmaceutical products in the United States, Europe, the Middle East, Africa, and other areas worldwide. The Company marketed its branded pharmaceutical products to physicians, pharmacists, pharmacy buyers, hospital procurement departments, ambulatory surgical centers, and specialty pharmacies. It distributed its branded and generic products through independent channels, including wholesale drug distributors, specialty pharmaceutical distributors, retail pharmacy chains, hospital networks, ambulatory surgical centers, and governmental agencies.

2.      The Securities Class Action primarily involves allegations that Mallinckrodt and certain of its senior officers, namely, Chief Executive Officer ("CEO") Mark Trudeau, Chief Financial Officer ("CFO") Matthew K. Harbaugh, and Hugh O'Neill, who was Executive Vice President and President, Autoimmune and Rare Diseases during the Relevant Period and is currently Executive Vice President and Chief Commercial Officer, issued a series of false and/or misleading material statements relating to the Company's key drug, H. P. Acthar Gel ("Acthar"), that artificially inflated the price of Mallinckrodt's common stock during the Relevant Period.

3.      In short, throughout the Relevant Period, Defendants made false and misleading statements and failed to disclose material adverse facts about the long-term sustainability of the Company's monopolistic revenues from Acthar and the exposure of Acthar to Medicare and Medicaid payments.  Defendants consistently represented during the Relevant Period that Acthar "has limited direct competition due to the unique nature of the product" when, in reality, its competitive advantage in the United States market derived at least in part from the Company's unlawful conduct that prevented alternative synthetic adrenocorticotropic hormone treatments from being developed and marketed in the United States.  Defendants also misrepresented the actual percentage of Acthar revenues derived from sales paid for by Medicare and Medicaid, and how the troubles it was facing with private insurers and the medical community would eventually adversely impact its Acthar sales and prospects.

4.      Defendants' knowing and/or reckless failure to disclose the truth about Acthar artificially inflated the price of Mallinckrodt common stock during the Relevant Period.  When the truth was disclosed, over a series of public statements by the Company and others, billions of dollars in shareholder value were lost, inflicting substantial damage to the Company.

A.      **The Development and Marketing of Acthar by Questcor**

5.      Acthar, which was originally created by an affiliate of the Armour & Company meat packing business from the pituitary glands of slaughtered pigs, was first licensed in 1952 by the United States Food and Drug Administration ("FDA").  From that time until the end of the Relevant Period, Acthar was the only therapeutic ACTH drug licensed by the FDA for use in the United States.[1]

6.      At the time Acthar was licensed by the FDA, an applicant pursuing approval of a new drug was only required to show that it was safe, not that it was also effective for its prescribed uses.  Since that time, the law has changed, and new drugs must be demonstrated to be ***both*** safe and effective.  However, this requirement did not apply to grandfathered drugs like Acthar that were approved before the change in the law governing the licensing of pharmaceutical drugs.

7.      In 2001, Questcor purchased Acthar from Aventis Pharmaceuticals for the sum of $100,000, plus modest royalties.  This relatively low price was reasonable as Acthar sold at that time for only $40 per vial, suiting its position as a relatively ancient drug, long off patent protection, that had not been actively marketed by Aventis and prescribed for only a very small number of patients.

8.      Following the acquisition of Acthar by Questcor, its new owner set out upon a new direction for the sale and marketing of the drug and drastically increased the price charged for Acthar, as described below.  Not only did Questcor significantly increase its sales and

---

[1] ACTH stands for adrenocorticotropic hormone, which is an adrenal hormone made in the pituitary gland that acts on the adrenal cortex to stimulate the production of steroid hormones. Acthar is an injected medication that is used to treat several types of conditions, including infantile spasms as well as disorders of the joints, skin, eyes, and respiratory system.   It works by stimulating the outer layer of cells of the adrenal gland, promoting the production of natural hormones that reduce inflammation.   Once injected, it is absorbed into the bloodstream and upon reaching the adrenal gland, steroid hormones (largely cortisol) are produced.

marketing efforts for Acthar, but it also sought FDA approval for the use of Acthar in treating Infantile Spasms.

9.      The FDA approved a supplemental new drug application for Acthar in the treatment of Infantile Spasms in October 2010.  Coincidentally, the FDA also approved a revised label that included 19 different medical conditions – down from the more than 50 different treatment indications for which Acthar had been previously approved.  According to an October 15, 2010 Questcor release, the 19 indications were organized under the following nine disease states:

**Infantile spasms**: H. P. Acthar Gel (repository corticotropin injection) is indicated as monotherapy for the treatment of infantile spasms in infants and children under 2 years of age.

**Multiple Sclerosis**: H. P. Acthar Gel (repository corticotropin injection) is indicated for the treatment of acute exacerbations of multiple sclerosis in adults. Controlled clinical trials have shown H. P. Acthar Gel to be effective in speeding the resolution of acute exacerbations of multiple sclerosis.  However, there is no evidence that it affects the ultimate outcome or natural history of the disease.

**Edematous State**: To induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus.

**Rheumatic Disorders**: As adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in Psoriatic arthritis, Rheumatoid arthritis, including juvenile rheumatoid arthritis (selected cases may require low-dose maintenance therapy), Ankylosing spondylitis.

**Collagen Diseases**: During an exacerbation or as maintenance therapy in selected cases of: systemic lupus erythematosus, systemic dermatomyositis (polymyositis)

**Dermatologic Diseases**: Severe erythema multiforme, Stevens-Johnson syndrome.

**Allergic States**: Serum sickness.

**Ophthalmic Diseases**: Severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa such as: keratitis, iritis, iridocyclitis,

diffuse posterior uveitis and choroiditis; optic neuritis; chorioretinitis; anterior segment inflammation.

**Respiratory Diseases**: Symptomatic sarcoidosis.

10.     From the time of its purchase of Acthar in the second half of 2001, Questcor's sales of Acthar increased from $9.0 million and $8.0 million in 2002 and 2003, respectively, to $114.7 million in 2010, and to $761.3 million in 2013.  By that time, Acthar sales accounted for more than 95% of Questcor's total revenues.  Taking advantage of Acthar's monopoly status as the only ACTH drug approved for sale in the United States, the price was raised from $40 per vial in 2001, to around $1,650 per vial by 2006, to more than $23,000 per vial in 2007, and to $28,000 per vial by 2012.

11.     On April 7, 2014, Mallinckrodt and Questcor entered into a merger agreement pursuant to which Mallinckrodt agreed to pay approximately $5.6 billion in cash and stock to Questcor shareholders.   The deal price translated to $86.10 per Questcor share, which represented a 27% premium over Questcor's closing price on the prior trading day's closing price.   In announcing the deal, Mallinckrodt, whose fiscal year 2014 would be ending on September 26, 2014, stated that it expected the deal to be immediately accretive to 2014 earnings and "significantly accretive" to 2015 results.   Defendant Trudeau further stated: "Acthar is increasingly being employed by specialty physicians in the treatment of a range of serious, difficult-to-treat autoimmune and inflammatory conditions, where patients often have exhausted other good therapeutic options."

12.     With the completion of the merger on August 14, 2014, Mallinckrodt acquired ownership of Acthar.  From that point onward, Acthar accounted for as much as 39% of Mallinckrodt's total revenues on an annual basis as Mallinckrodt extended its marketing efforts of the product and continued to increase its price, resulting in a price of more than $34,000 per

vial in 2016, which was 850 times its cost of $40 in 2001.  As demonstrated in Company presentations, although Acthar was approved by the FDA for use in connection with 19 treatments, the Company only marketed Acthar in the United States for nine medical conditions in four areas: Neurology (for Infantile Spasms and Multiple Sclerosis flares in adults); Rheumatology (for Lupus, Dermatomyositis/polymositis, Rheumatoid Arthritis flares, Psoriatic Arthritis flares, and Ankylosing Spondylitis flares); Pulmonology (Symptomatic Sarcoidosis); and Nephrology (Edematous State (remission of proteinuria in Nephrotic Syndrome)).

**B.    The Unlawful Efforts to Block Competition to Acthar and Preserve Acthar's ACTH Monopoly**

13.    The only potentially competing ACTH product to Acthar in the United States were Synacthen and Synacthen Depot[2] (together, "Synacthen"), which, unlike Acthar, are synthetic compounds made in a laboratory, and thus a potentially more attractive drug whose consistency and purity could be ensured and carefully monitored in the manufacturing process.

14.    Before 2013, Synacthen was owned by Novartis AG and was licensed and sold in various other countries and regions, including in Canada and Europe, to treat many of the same conditions for which Acthar was approved in the United States.  However, Synacthen could not be sold in the United States because it had not yet attained the requisite FDA approval, which now required proof that it was both safe and effective via the submission of a new drug application (unlike Acthar, which had been licensed for sale in 1952 based solely on evidence that it was safe).  The U.S. licensing of Synacthen was dependent upon prior completion of adequate testing to prove, to the FDA's satisfaction, both the safety and efficacy for each disease for which it would be used.

---

[2] A depot is a drug formulation that allows gradual absorption, over a long period, from a quantity deposited by injection under the skin or in a muscle.

15.     The existence of Synacthen, which has the same first 24 amino acids as Acthar, challenged the monopoly held by Questcor, and later, Mallinckrodt, if Synacthen could be offered as an alternative in the United States for the high priced Acthar.  This made Synacthen a very attractive investment to other pharmaceutical companies seeking to challenge Questcor's U.S. monopoly on ACTH-based drugs.

16.     The prospect of competition from Synacthen was greatly appreciated by Questcor, and thereby made the purchase of Synacthen by Questcor critical to preserving the U.S. monopoly in ACTH drugs that was seen as essential to the financial success of Questcor.

17.     When Novartis let it be known that it was considering licensing the rights to manufacture and sell Synacthen in the United States, and most of the rest of the world, other than countries for which Novartis had already transferred those rights, several prospective acquirers emerged.

18.     At least three companies, other than Questcor, simultaneously negotiated with Novartis to acquire these rights to Synacthen.   However, Synacthen had a unique value to Questcor, as it sought to control this single potentially competing alternative ACTH drug in the United States market by obtaining the exclusive rights to develop, manufacture and sell Synacthen in the United States and many other countries, particularly because Acthar accounted for approximately 95 percent of Questcor's revenues at that time.

19.     Compelled by its desire to preserve its monopoly on ACTH medications in the United States, Questcor far outbid the three alternative acquirers and announced that it was successful in acquiring the rights to develop and market Synacthen in the United States and many countries outside the United States in June 2013.   At the time Questcor acquired Synacthen, Questcor's Chief Scientific Officer stated that the company intended to "develop and

seek FDA approval for Synacthen" and was "committed to developing this product not only in conditions different than Acthar but also in conditions where Synacthen would potentially provide a clinical benefit over Acthar."

20.     Questcor was purchased by Mallinckrodt in August 2014.   With that transaction, Mallinckrodt acquired ownership of the Acthar franchise as well as the rights to develop Synacthen in the United States (subject to FDA approval) and to market and sell it in many countries outside the United States where it was already approved.   However, the leadership of Mallinckrodt had no intention to develop Synacthen in the U.S. market for any indications that could potentially compete with its lucrative Acthar franchise.   Instead, from the time that Mallinckrodt acquired Questcor, Mallinckrodt sought to preserve the unlawful ACTH monopoly and reap monopoly profits from the sale of Acthar by seeking to develop Synacthen for only one medical treatment that did not overlap in any way with any of the treatments for which Mallinckrodt was marketing Acthar.

21.     As a result, Mallinckrodt engaged in unlawful, anticompetitive, monopolistic conduct.   Mallinckrodt and its executives acted, and throughout the Relevant Period would continue to act, to unlawfully forestall any meaningful competition for its monopoly product, all while making false and materially misleading statements to investors about the "competition" to Mallinckrodt's Acthar products. Such statements, which are identified and more fully described below, served to create a false impression of the Company's ability to preserve and exploit its monopoly position and resulting profits, and artificially inflated the prices of Mallinckrodt's securities during the Relevant Period.

22.     Additionally, Mallinckrodt and its top executives affirmatively lied to investors regarding the true extent of Acthar's reliance on Medicare and Medicaid by intentionally

providing false data to the market in the fall of 2015 that Acthar was not as dependent on reimbursements from these programs as it actually was.  This fact was crucial to investors, and when they finally learned the truth – that the percentage of Acthar sales paid for by Medicare and Medicaid, rather than private insurance companies, was *far higher* than the level publicly reported – the Company's stock price fell, illustrating the greater risk associated with the private insurers' reluctance to pay stratospheric prices for Acthar.

### C.   The Truth About Mallinckrodt's Acthar Franchise and Practices Comes to Light Over a Series of Disclosures and Actions

23.   The hyper-inflation of the price of Acthar prompted an inevitable reaction as insurers and other payers started to push back.  Although there were indications that Questcor had faced some insurer resistance to certain of the uses for which Questcor was selling Acthar, the first revelation of problems with private insurers that affected Mallinckrodt's bottom line came on August 4, 2015, when the Company reported its third quarter earnings and announced a slight reduction in its sales forecast for Acthar because of pressure from health insurance companies and other payers regarding the drug's exorbitant cost.   During an August 4, 2015 earnings conference call, Defendant Trudeau said that Acthar was facing a more difficult payer environment than the previous year, which was changing the Company's perspective on the long-term prospects for the drug.  As a consequence, the price of Mallinckrodt stock dropped 14% from $124.21 per share to $106.73 per share, as investors started to question the sustainability of Acthar's pricing, thereby threatening one of the Company's primary sources of revenue and earnings.  But Defendants continued to make false and misleading statements about the Company's operations relating to Acthar, as well as the Company's ability to attain reimbursement from private insurers for Acthar sales.

24.     During this same time period, the skyrocketing prices of certain pharmaceutical products was a strongly debated topic, both generally and as it impacted spending by the Government through the Medicare and Medicaid systems.   This understandably led the investment community to seek out information concerning the extent of Acthar's exposure to Medicare and Medicaid.   In response to this questioning during an October 6, 2015 investor presentation, Defendant Trudeau stated that the Company's combined revenues from Medicare and Medicaid were roughly 25% of Mallinckrodt's total revenues, and that the proportion of Acthar revenues attributable to Medicare and Medicaid was "***maybe a little higher than that***."[3] As would be disclosed later in the Relevant Period, Medicare and Medicaid reimbursements actually accounted for over ***60% and over 61%*** of the Company's total sales of Acthar in 2014 and 2015, respectively.

25.     The truth about Mallinckrodt's dependence on Acthar sales for its profitability as well as its dependence on Medicare and Medicaid reimbursements for revenue from the sale of Acthar started to surface when Andrew Left, an activist short seller, author and editor of the online investment newsletter Citron Research ("Citron"), which at the time was best known for uncovering fraudulent practices to inflate drug sales at Valeant Pharmaceuticals, tweeted on November 9, 2015, that Mallinckrodt stock had significantly more "downside" than Valeant and was "a far worse offender of the reimb[ursement] sys[tem]." Valeant had been a notorious case of fraud tied, in part, to massive inflation of prescription drug prices, and led to numerous Government investigations, private securities litigation and criminal charges.   By issuing this statement, Citron helped to reveal the impact of the wrongdoing by Mallinckrodt, and that it was

_____

[3] Unless otherwise indicated, emphasis provided by bolded and italicized text has been added in this Complaint.

even greater than the notorious benchmark provided by Valeant, which the market knew had already resulted in substantial harm to investors.

26.     Following that Citron tweet, shares of Mallinckrodt dropped 17% from $69.89 per share, the closing price of the Company's stock on November 6, 2015, to $58.01 per share at the close on November 9, 2015.  This was the largest one-day drop in the price of the stock since Mallinckrodt was spun-off from Covidien PLC in 2013.

27.     Citron tweeted another statement on March 15, 2016 underscoring the increasing risk posed by Mallinckrodt's anticompetitive behavior – "Mkt. is starting to realize that $MNK [Mallinckrodt] equal risk to $VRX [Valeant]." Citron's Andrew Left appeared on CNBC's Fast Money that same day and said that Mallinckrodt made Valeant look like a "choirboy" and referred to Acthar as the "poster child" of price gouging.  Left explained: "I think Mallinckrodt is worse [than Valeant] *because they are dependent on one drug, close to let's say 50 percent of their EBITDA*, depends on what metric you want to look at, is dependent on one particular drug. Not let's say 30 [different drugs] that Valeant has."

28.     The importance of Left's observations sent the price of Mallinckrodt stock down by 20% over a two-day period from a close of $69.61 per share on March 14, 2016 to a close of $55.69 per share on March 16, 2016, illustrating the magnitude of this disclosure.  But this did not fully disclose the full extent of Defendants' prior false and misleading statements, which continued throughout the remainder of the Relevant Period.

29.     The true extent of Mallinckrodt's reliance on Acthar's Medicaid and Medicare reimbursements was not revealed until November 16, 2016, when Citron published a report based on information displayed on the website of the Centers for Medicare and Medicaid ("CMS") of the United States Department of Health and Human Services on November 14, 2016

(the "Citron Report").  The Citron Report compared the new information issued by CMS against the statements Trudeau had made during the October 6, 2015 investor presentation.  The Citron Report revealed that Medicare and Medicaid paid approximately $504 million and $144.6 million respectively for Acthar in 2015, payments that collectively amounted to over 61% of Mallinckrodt's total sales of Acthar in 2015.  That was a far cry from the 25% or "maybe a little higher" that Trudeau had provided to the market on October 6, 2015.

30.     In response to the issuance of the Citron Report revealing the truth about the overwhelming percentage of Acthar sales attributable to payments by Medicare or Medicaid, rather than private insurance, shares of Mallinckrodt dropped 18.4% from a close of $67.80 per share on November 15, 2016 to a close of $59.65 on November 16, 2016 and to a close of $55.32 per share on November 17, 2016.  Yet, again, this still did not reveal the full extent of the Company's false statements and illegal conduct regarding its marketing and sale of Acthar.

31.     On January 18, 2017, the U.S. Federal Trade Commission ("FTC") and five states charged Mallinckrodt and its Questcor subsidiary with unfair methods of competition and acts of monopolization in violation of the Sherman Act, and announced that the Company and its Questcor division had entered into a Consent Decree to resolve the FTC's charges.  A complaint was filed at the conclusion of the FTC's more than two-year long investigation (the "FTC Complaint").

32.     The FTC Complaint detailed the foundation for establishing that Synacthen was a potentially competing ACTH drug to Acthar.  The FTC Complaint pointed out that "[i]n Europe, Canada, and other parts of the world, doctors treat patients suffering from [the] same conditions [treated with Acthar] with Synacthen Depot." FTC Complaint ¶ 6.  It also stated that "[i]n 2006, when Questcor decided to pursue an 'orphan' (i.  e., high) pricing model for Acthar, it

recognized the potential threat Synacthen posed to Acthar's revenue growth," and that it approached Novartis, the then-current owner of Synacthen, about acquiring Synacthen in 2009. After Questcor failed to acquire the rights to develop and market Synacthen at that time, "Questcor continued to monitor the competitive threat from Synacthen," and ultimately outbid at least three other serious prospects to acquire it.  The FTC Complaint stated:

> Unbeknownst to Questcor at the time, Novartis decided in late 2011 to divest exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States, along with the marketing rights for Synacthen in over thirty-five other countries where the drug was already approved and sold.  Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen. Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.  (FTC Complaint ¶ 41).

> Each of the three firms planned to develop Synacthen for IS [infantile spasms] and/or IMN [idiopathic membranous nephropathy, the single largest cause of a kidney disorder called nephrotic syndrome ("NS")] and use Synacthen to compete directly with Acthar.  With approval for one or both of these indications, each firm expected to capture a significant share of the U.S. ACTH market from Questcor by pricing Synacthen well below Acthar.  Having the requisite pharmaceutical expertise and financing, the three firms independently conducted due diligence, crafted business plans and regulatory approval strategies, and took other affirmative steps in furtherance of developing Synacthen for the U.S. market.  (FTC Complaint ¶ 42).

> \*        \*        \*

> In October 2012, Questcor learned that at least one unidentified firm was attempting to acquire Synacthen from Novartis and develop it for the United States.  Questcor immediately attempted to reach Novartis and shortly thereafter signed a confidentiality agreement with Novartis and submitted an offer for Synacthen.  (FTC Complaint ¶ 46).

> Novartis negotiated with the three alternative bidders in parallel with Questcor. By the spring of 2013, all three of the alternative bidders had submitted offers for Synacthen, with plans to develop and launch Synacthen in the United States in direct competition with Acthar.  (FTC Complaint ¶ 47).

> \*        \*        \*

Unlike the three alternative bidders, Questcor had only inchoate plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. (FTC Complaint ¶ 48).

33.    On the same day the FTC filed its Complaint, the Company entered into a Consent Decree with the FTC and announced a settlement of its charges.  To settle the FTC charges, Mallinckrodt was required to pay a $100 million fine to the federal government and to sub-license certain of its U.S. development rights to Synacthen to a company that would need to be approved by the FTC.  The sub-license was for two of the primary indications for which Mallinckrodt has marketed and sold Acthar: Infantile Spasms and Nephrotic Syndrome.

34.    The news of the FTC settlement caused the Company's stock to drop 5.85% or $2.89, to a close of $46.53 per share on January 18, 2017, from its previous close of $49.42 per share on January 17, 2017.

35.    Even after the revelations concerning the true extent of Acthar sales that were reimbursed by Medicare and Medicaid compared to private insurers and the settlement with the FTC, Defendants continued to make statements that misled the market with regard to the long-term prospects for the Company's Acthar sales and served to maintain Mallinckrodt's stock price at artificially inflated levels.  These included statements regarding Acthar's stated growth across the payer mix, strengthened formulary positions, removal or relaxation of previous formulary restrictions, expansion in terms of the number of commercial lives under contract, and guidance that was consistently stated and reiterated throughout 2017 for mid-single digit to low double digit growth in net Acthar sales.

36.    The falsity of Defendants' statements in this regard became known when, on November 7, 2017, the Company reported for the first time in its history that net sales of Acthar in the quarter had declined from the net sales in the comparable quarter in the prior year.  In

particular, the Company disclosed that its net Acthar sales in the third quarter ended September 29, 2017 were $308. 7 million, down by 5.6% from net sales of $327. 0 million during the same quarter in 2016. The Company attributed the sales decline, in part, to a volume decline that resulted from "an increasing number of prescriptions going unfilled beyond the level we had seen previously," and said that the Company expected that fourth quarter 2017 net Acthar sales would also be down sequentially. Moreover, in responding during a conference call to one of the many analyst questions concerning the Company's Acthar sales, Defendant Trudeau conceded that Acthar "continues to experience payer pressures" and "we expect those payer pressures to continue to be more challenging. We expect payers to put more and more hurdles in front of patients getting reimbursement.… The situation that we're experiencing now is this combination of both those payer pressures, plus … the additional issue that we're seeing with these patient prescriptions going unfilled at this point."[4]

37.     With these disclosures, the full truth about Mallinckrodt's Acthar's business was finally revealed. The price of Mallinckrodt stock fell by 35.5%, falling by $11.07 per share from a closing price of $31.18 on November 6, 2017, to a closing price of $20.11 on November 7, 2017, on enormous volume of over 34 million shares traded. The Company's stock price has continued to decline, closing at approximately $4.00 on August 21, 2019.

---

[4] The decline in Acthar sales in the third quarter 2017 from the comparable quarter in 2016 was no fluke. Confirming that the Company was facing far greater reimbursement issues with private insurers than had been disclosed during the Relevant Period, declining sales have worsened in the fourth quarter 2017 and the first quarter 2018. Net Acthar sales declined 9.3% in the fourth quarter 2017 compared to the fourth quarter 2016, and they declined 10.3% in the first quarter 2018 compared to the first quarter 2017.

Mallinckrodt used the term "payor" in SEC filings in 2014, but thereafter used the term "payer" in its SEC filings. Accordingly, unless the term is quoted from a year 2014 SEC filing, this Complaint shall hereafter use the term "payer" rather than "payor," even if a call transcript showed it otherwise.

38.     As a result of Defendants' wrongful conduct, Mallinckrodt disseminated false and misleading statements, and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Mallinckrodt's credibility. Mallinckrodt has been, and will continue to be, severely damaged and injured by Defendants' misconduct.

## II.     JURISDICTION AND VENUE

39.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1331 because the claims arise under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

40.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation within this District by doing business here and engaging in numerous activities that had an effect in this jurisdiction. In particular, the settlement between the FTC and Mallinckrodt was filed in this District. *See* Joint Mot. for Entry of Stipulated Order for Perm. Inj. & Equitable Monetary Relief, *Federal Trade Comm'n v. Mallinckrodt ARD Inc.,* No. 1:17-cv-00120, ECF No. 2 (D.D.C. Jan. 18, 2017).

41.     In relation to the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

### A.    Plaintiff

42.    Plaintiff has continuously been a shareholder of the Company throughout the period of the wrongdoings complained of herein, and is a current shareholder.

### B.    Nominal Defendant

43.    Nominal Defendant Mallinckrodt is a corporation organized under the laws of Ireland, and is based in Staines-upon-Thames, England.   Mallinckrodt maintains its U.S. headquarters at 675 McDonnell Blvd., St.  Louis, MO 63042.   According to the Company's public statements and filings with the SEC, the Company develops, manufactures, markets, and distributes branded and generic specialty pharmaceutical products worldwide.   Mallinckrodt's Specialty Brands segment, which markets Acthar, markets branded pharmaceutical products for autoimmune and rare diseases, including the specialty areas of neurology, rheumatology, nephrology, ophthalmology, and pulmonology; as well as immunotherapy and neonatal respiratory critical care therapies and central nervous system drugs.   During the Relevant Period, the Company also had a Specialty Generics line of business, which has been discontinued, that provided specialty generic pharmaceuticals and active pharmaceutical ingredients. Mallinckrodt's common stock shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "MNK."

### C.    Defendants

44.    Defendant Mark Trudeau was, at all relevant times, CEO and President of Mallinckrodt, a member of the management executive committee, and also served as a member of the Company's Board of Directors.   In anticipation of the spin-off of Mallinckrodt from Covidien PLC, Trudeau joined Covidien plc in February 2012 as a Senior Vice President and President of its Pharmaceuticals business.   He became CEO and President of Mallinckrodt in

June 2013, when Mallinckrodt became an independent public company.  Trudeau joined

Covidien from Bayer HealthCare Pharmaceuticals LLC USA, the U.S. healthcare business of

Bayer AG, where he served as Chief Executive Officer.  He simultaneously served as President

of Bayer HealthCare Pharmaceuticals, the U.S. organization of Bayer's global pharmaceuticals

business.  In addition, he served as Interim President of Bayer's global specialty medicine

business unit from January to August 2010.  Before joining Bayer in 2009, Trudeau headed the

Immunoscience Division at Bristol-Myers Squibb.  During his time at Bristol-Myers Squibb, he

served in multiple senior roles, including President of the Asia/Pacific region, President and

General Manager of Canada and General Manager/Managing Director in the United Kingdom.

Trudeau was also with Abbott Laboratories, serving in a variety of executive positions, from

1988 to 1998.

45.    Throughout the Relevant Period, Trudeau signed each of the SEC Forms 10-K

and 10-Q publicly issued by the Company and filed with the SEC, and regularly participated on

the Company's quarterly earnings calls and in other investor or analyst presentations.  Trudeau

also made statements alleged to be materially false and misleading in this Complaint.

46.    During the years 2014 through 2017, Trudeau received the following total

compensation from the Company:

| | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| **Trudeau** | $6,502,676 | $9,728,506 | $12,647,466 | $15,026,710 |

47.    Defendant Matthew K.  Harbaugh ("Harbaugh") was, at all relevant times, Vice

President and CFO of Mallinckrodt.  Harbaugh formerly served as Vice President, Finance of

Covidien's Pharmaceuticals business, a position he held from July 2008 until June 2013, when

Mallinckrodt spun-off from Covidien and became an independent public company.  He also

served as Interim President of Covidien's Pharmaceuticals business from November 2010 to

January 2012.  Harbaugh joined Covidien's Pharmaceuticals business in August 2007 as its Vice

President and Controller, Global Finance for the Global Medical Imaging business.  He was also

a Lead Finance Executive with Cerberus Capital Management, L.P., a New York-based private

equity firm, from April 2007 until August 2007.  Prior to that Harbaugh worked nearly ten years

for Monsanto, where he held several positions, including corporate finance director, investor

relations, and finance director/chief financial officer for Monsanto's Argentine/Chilean and

Canadian operations via two expatriate assignments.

48.     Throughout the Relevant Period, Harbaugh signed each of the Company's Forms

10- K and 10-Q publicly issued and filed with the SEC, and also regularly participated on the

Company's quarterly earnings calls and in other investor or analyst presentations:

49.     During the period from 2014 through 2017, Harbaugh received the following total

compensation from the Company:

|  | 2014 | 2015 | 2016 | 2017 |
| --- | --- | --- | --- | --- |
| **Harbaugh** | $2,140,236 | $2,699,476 | $3,996,830 | $7,203,193 |

50.     Defendant Hugh O'Neill ("O'Neill") was, at all times relevant, an Executive Vice

President and President, Autoimmune and Rare Diseases ("ARD") at the Company's

Mallinckrodt Pharmaceuticals division.  He also served as a member of Mallinckrodt's executive

committee.  According to the Company's website, O'Neill has executive responsibility and

directly manages all commercialization efforts and broad market access activities for ARD

portfolio within the Company's Specialty Brands segment, which includes Acthar.  He is

currently Executive Vice President and Chief Commercial Officer at Mallinckrodt.  Prior to

joining Mallinckrodt, O'Neill held various commercial leadership positions at Sanofi, including

vice president of commercial excellence, general manager, president of Sanofi Canada, and vice president of market access and business development. He had also worked at Pharmacia, Novartis and Sandoz.

51. Throughout the Relevant Period, O'Neill regularly participated on the Company's earnings calls and in other investor and analyst presentations.

52. During the period from 2014 through 2017, O'Neill received the following total compensation from his service as an executive with the Company:

|          | 2014        | 2015        | 2016        | 2017        |
|----------|-------------|-------------|-------------|-------------|
| O'Neill  | $2,441,812  | $2,261,961  | $2,788,481  | $5,694,232  |

53. Defendants Trudeau, Harbaugh, and O'Neill are referred to collectively herein as the "Officer Defendants."

54. Defendant Angus Russell ("Russell") has been the chairman of the Board since May 2018 and a director since August 2014. Defendant Russell is a member of the Board's Portfolio Committee and its Audit Committee.

55. Defendant David Carlucci ("Carlucci") has been a member of the Board since 2014. Defendant Carlucci is a member of the Board's Human Resources and Compensation Committee.

56. Defendant J. Martin Carroll ("Carroll") has been a member of the Board since 2013. Defendant Carroll is a member of the Board's Governance and Compliance Committee.

57. Defendant David Norton ("Norton") has been a member of the Board since 2017. Defendant Norton is a member of the Board's Human Resources and Compensation Committee.

58. Defendant JoAnn Reed ("Reed") has been a member of the Board since 2013. Defendant Reed is a member of the Board's Audit Committee.

59.     Defendant Kneeland Youngblood ("Youngblood") has been a member of the Board since 2013.   Defendant Youngblood is a member of the Board's Governance and Compliance Committee.

60.     Defendants Trudeau, Russell, Carlucci, Carroll, Norton, Reed, and Youngblood are collectively referred to herein as the Director Defendants

61.     The Director Defendants, together with the Officer Defendants, are referred to collectively herein as the "Defendants."

**D.      Related Party Non-Defendants**

62.     Paul R. Carter ("Carter") has been a member of the Board since 2018.  Carter is a member of the Board's Audit Committee.  Carter is named solely for the purpose of demand futility.

63.     Carlos V. Paya ("Paya") has been a member of the Board since 2019.  Paya is a member of the Board's Portfolio Committee.  Paya is named solely for the purpose of demand futility.

64.     Anne C.  Whitaker ("Whitaker") has been a member of the Board since 2018. Whitaker is a member of the Board's Human Resources and Compensation Committee. Whitaker is named solely for the purpose of demand futility.

**IV.     SUBSTANTIVE ALLEGATIONS**

**A.      Mallinckrodt Goes Public and Acquires a Series of Companies**

65.     Mallinckrodt is a specialty pharmaceutical company that develops, manufactures, markets and distributes branded and generic pharmaceutical products and therapies.   The Company was spun-off from Covidien PLC in June 2013 and began trading on the NYSE on July 1, 2013.

66.    After going public in 2013, Mallinckrodt made several acquisitions of other pharmaceutical companies.  The major ones were:

| Date | Acquired | Amount |
|------|----------|--------|
| Feb. 11, 2014 | Cadence Pharmaceuticals | $1.3 billion |
| Apr. 7, 2014 | Questcor Pharmaceuticals | $5.6 billion |
| Mar. 5, 2015 | Akaria | $2.3 billion |
| Aug. 10, 2015 | Therakos | $1.33 billion |
| Aug. 10, 2016 | Stratatech Corp. | Not reported |

67.    By acquiring pharmaceutical companies like Cadence and Questcor with old drugs that have little competition, Mallinckrodt could immediately increase their price.  For example, in February 2014, Mallinckrodt purchased Cadence Pharmaceuticals.  After the acquisition, Mallinckrodt increased the cost of injectable acetaminophen from $14.60 to $35.05 for each 1gram vial – a *140%* increase over the 37% price increase implemented by Cadence during the three years before the Company's acquisition.

### B.    Mallinckrodt's Acquisition of Questcor

68.    In August 2014, Mallinckrodt acquired Questcor for $5.6 billion in cash and shares of the Company's common stock.  At that time, Acthar comprised substantially all of Questcor's net sales.  In 2001, Questcor had acquired the rights to Acthar for $100,000, plus modest royalties when Acthar was selling for $40 per vial.  Questcor steadily increased the price, including a steep increase in 2007 to more than $23,000 per vial from $1,650 per vial from 2006.

69.    Acthar was, and remains today, the only approved therapeutic preparation of ACTH in the United States.  Acthar is currently approved by the FDA as a treatment for 19

different conditions, including Infantile Spasms and other serious conditions, including autoimmune and inflammatory conditions.

70.     As stated in Questcor's Form 10-K for the year ended December 31, 2013 ("Questcor 2013 10-K"), Questcor derived substantially all of its pharmaceutical net sales from the use of Acthar in connection with four indications, which were described as follows in the Questcor 2013 10-K:

> *Questcor Pharmaceutical Segment Nephrotic Syndrome (NS):*
>
> Acthar is indicated "to induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due [sic.] to lupus erythematosus." According to the National Kidney Foundation, nephrotic syndrome can result from several idiopathic type kidney disorders, including idiopathic membranous nephropathy, focal segmental glomerulosclerosis, IgA nephropathy and minimal change disease.  Nephrotic syndrome can also occur due to lupus erythematosus.  In this Form 10-K, the terms "nephrotic syndrome" and "NS" refer only to the proteinuria in nephrotic syndrome conditions that are covered by the Acthar label of approved indications.
>
> Rheumatology Related Conditions: Acthar is approved for the following rheumatology related conditions: (i) Collagen Diseases: Acthar is indicated "during an exacerbation or as maintenance therapy in selected cases of systemic lupus erythematosus, systemic dermatomyositis (polymyositis)" and (ii) Rheumatic Disorders: Acthar is indicated as "adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in: Psoriatic arthritis, Rheumatoid arthritis, including juvenile rheumatoid arthritis (selected cases may require low-dose maintenance therapy), Ankylosing spondylitis."
>
> Multiple Sclerosis (MS): Acthar is indicated "for the treatment of acute exacerbations of multiple sclerosis in adults.  Controlled clinical trials have shown H. P. Acthar Gel to be effective in speeding the resolution of acute exacerbations of multiple sclerosis.  However, there is no evidence that it affects the ultimate outcome or natural history of the disease."
>
> Infantile Spasms (IS): Acthar is indicated "as monotherapy for the treatment of infantile spasms in infants and children under 2 years of age."

71.     The Questcor 2013 10-K provided the following background regarding the development of Acthar, its approval for 19 different treatments in the United States, and the testing that had and had not been required to obtain FDA approval for Acthar's use in humans:

> Acthar was originally approved by the FDA in 1952, for the treatment of approximately 50 different medical conditions, or "indications." This was prior to the enactment of the 1962 Kefauver Harris Amendment, or the "Drug Efficacy Amendment," to the Food, Drug, and Cosmetic Act, which introduced the requirement that drug manufacturers provide proof of the effectiveness (in addition to the previously required proof of safety) of their drugs before approval. As such, the FDA's original approval in 1952 was based on safety; clinical trials evaluating efficacy were not required.  In the 1970s the FDA reviewed the safety and efficacy of Acthar during its approval of Acthar for the treatment of acute exacerbations in Multiple Sclerosis (MS) and evaluated all other previous indications on the label through the process called DESI – Drug Efficacy Study Implementation.  In this process the medical and scientific merits of the label and each indication on the label were evaluated based on publications, information from sponsors, and the judgment of the FDA.  The label obtained after the DESI review and the addition of the MS indication is the Acthar label that was used until the most recent changes in 2010.

72.     The Questcor 2013 10-K further disclosed the critical importance of Acthar sales to its overall operations, and the significant growth in sales that Questcor had achieved over the prior three years, as follows:

> Our total net sales were $798.9 million for the year ended December 31, 2013 as compared to $509.3 million and $218.2 million for the years ended December 31, 2012 and 2011, respectively.  Over 95% of our net sales in each of these years were from Acthar.  Our net income was $292.6 million for the year ended December 31, 2013 as compared to $197.7 million and $79.6 million for the years ended December 31, 2012 and 2011, respectively.

73.     Questcor also described its acquisition in June 2013 of the rights to market Synacthen, a synthetic ACTH drug, in the United States and in certain countries overseas, in the Questcor 2013 10-K, as follows:

> *Acquisition of Synacthen and Synacthen Depot*

> On June 11, 2013, the Effective Date, we acquired from Novartis AG and Novartis Pharma AG, collectively Novartis, a license to develop, market,

manufacture, distribute, sell and commercialize Synacthen and Synacthen Depot for all uses in humans in the United States.  Subject to certain conditions and limitations in the License Agreement, the license is exclusive, perpetual and irrevocable.  Synacthen Depot is a synthetic melanocortin agonist approved in various countries outside of the United States for certain autoimmune and inflammatory conditions.  ***Since our acquisition of Synacthen and Synacthen Depot, we have implemented a new research and development program for Synacthen Depot and intend to seek FDA approval***.  Prior to our acquisition, Synacthen Depot has never been developed for approval for patients in the United States.

Subject to certain closing conditions, we also will acquire from Novartis a license and certain assets to develop, market, manufacture, distribute, sell and commercialize Synacthen and Synacthen Depot in certain countries outside the U.S. for all uses in humans.  Subject to certain conditions and limitations, these rights and assets are exclusive, perpetual and irrevocable.  Under the terms of the transaction agreements, we paid Novartis an upfront consideration of $60.0 million.  We will also be making annual cash payments of $25 million on each of the first, second and third anniversaries of the Effective Date, a potential additional annual cash payment on each anniversary subsequent to the third anniversary until we obtain the first approval of the FDA related to the products, or the FDA Approval, and a milestone payment upon our receipt of the FDA Approval.  If we successfully obtain FDA Approval, we will pay an annual royalty to Novartis based on a percentage of the net sales of the product in the U.S. market until the maximum payment is met.  The first three annual payments aggregating to $75.0 million are secured by a letter of credit and classified as restricted cash on the Consolidated Balance Sheets.  In no event will the total payments related to this transaction exceed $300 million.

74.    And, relating to Questcor's research and development actions relating to Acthar and Synacthen, Questcor stated the following in the Questcor 2013 10-K:

**Research and Development**

Our research and development program for Acthar is focused on: (i) the continued evaluation of the use of Acthar for certain on-label indications; (ii) the investigation of other potential uses of Acthar for indications not currently FDA approved; and (iii) the expansion of our understanding of how Acthar works in the human body (pharmacology), and ultimately, its mechanism(s) of action in the disease states for which it is currently used, or may be used in the future.  We conduct research internally and also through contracts with third parties.

We are currently conducting on-label Phase 4 clinical trials in Nephrotic Syndrome and Systemic Lupus Erythematosus.  We are currently conducting Phase 2 clinical trials in Diabetic Nephropathy, Amyotrophic Lateral Sclerosis

and Acute Respiratory Distress Syndrome to explore the possibility of pursuing FDA approval for indications not currently on the Acthar label. We continue to conduct non-clinical and clinical pharmacology studies to expand our understanding of Acthar and its mechanism of action(s).

We also provide financial grants to support independent academic research such as investigator initiated studies. In 2013, we provided $3. 2 million in financial grants to support investigator initiated studies.

We have also initiated a research and development program for Synacthen Depot. Novartis has the right to terminate the license allowing us to develop, market, manufacture, distribute, sell and commercialize Synacthen and Synacthen Depot in the United States under certain circumstances, including if we fail within time periods set forth in the License Agreement to achieve certain development milestones related to (i) conducting a pre-IND meeting with the United States Food and Drug Administration, or FDA, with respect to Synacthen or Synacthen Depot, (ii) commencing a clinical trial with respect to Synacthen or Synacthen Depot and (iii) submitting a new drug application, or NDA, for Synacthen or Synacthen Depot for filing with the FDA.

We anticipate that these research and development efforts will result in a significant increase in research and development expense in 2014 and future years.

During the years ended December 31, 2013, 2012 and 2011, we spent $59.7 million, $34.3 million and $16.8 million, respectively, on research and development activities.

75.     When Questcor acquired the rights to develop and market Synacthen and Synacthen Depot in the United States from Novartis, Questcor's Chief Scientific Officer was quoted in Questcor's June 11, 2013 press release, as saying that the company "***intends to develop and seek FDA approval for Synacthen***" and was "***committed to developing this product not only in conditions different than Acthar but also in conditions where Synacthen would potentially provide a clinical benefit over Acthar***." But during the nearly four years since Mallinckrodt's acquisition of Questcor, as described more fully below, Mallinckrodt has developed to the point of seeking FDA approval only for a single treatment indication for Synacthen (which Mallinckrodt would later refer to as MNK-1411), and that is for the treatment

of a condition (Duchene Muscular Dystrophy or "DMD"), which is not one of the 19 FDA-approved treatment indications for Mallinckrodt's Acthar product.

### C.      Mallinckrodt's Actions Relating to Acthar and Synacthen

76.     An October 14, 2014 Mallinckrodt Pharmaceuticals Investor Briefing set forth the 19 diseases and/or conditions for which the FDA had approved Acthar, and further identified the 9 indications for which Acthar was then being marketed.[5] The nine approved and marketed uses were:

**Neurology**

>    Infantile Spasms
>    Multiple sclerosis flares in adults

**Rheumatology**

Multiple organs (including muscle and joint):
>    Lupus
>    Dermatomyositis/polymositis
>    Rheumatoid arthritis flares
>    Psoriatic arthritis flares

77.     The same list was included in an Investor Briefing dated December 7, 2015,[6] which also included a chart titled "Acthar has low patient penetration across majority of approved indications." The chart indicated approximately a 50% share of addressable patients treated by Acthar for infantile spasms; approximately an 18% share of addressable patients treated by Acthar for multiple sclerosis; approximately 6% and 4% shares of addressable patients treated for proteinuria remissions in idiopathic nephrotic syndrome and rheumatoid arthritis

---

[5] Accessible at: http://phx.corporateir.net/External.File?item=UGFyZW50SUQ9NTU3MTQ5fE NoaWxkSUQ9MjU0NzI2fFR5cGU9MQ== &t=1 at 15.
[6] Accessible at: http://phx.corporateir.net/External.File?item=UGFyZW50SUQ9NjA0Nzk5 fENoaWxkSUQ9MzE1OTAayfFR5cGU9MQ== t=1.

(adjuvant therapy), respectively; and lower amounts for the five other approved and marketed uses.

78.     In the years after Mallinckrodt's acquisition of Questcor, Mallinckrodt reported increasing net sales of Acthar.  During the six-week period from August 14, 2014 through September 26, 2014 (the end of Mallinckrodt's fiscal year 2014), its net sales of Acthar were $122. 9 million.  Mallinckrodt FY 2014 Form 10-K, at 54-55.  During fiscal year 2015, ended September 25, 2015, its net sales of Acthar were $1.0373 billion (compared to total revenues of $3.4569 billion).  Mallinckrodt FY 2015 Form 10-K, at 54, 55.  And during fiscal year 2016, ended September 30, 2016, its net sales of Acthar were $1.1604 billion (compared to total revenues of $3.3808 billion).  Mallinckrodt FY 2016 Form 10-K, at 43, 51.

79.     At the close of its FY 2014, the Company attributed the increases in its operating income and margins "primarily due to higher net sales of high margin products, such as Acthar and Ofirmev …," among other reasons.  Mallinckrodt FY 2014 Form 10-K, at 56.  It similarly attributed the increases in the Company's operating income and margins in fiscal year 2015 primarily to the timing of its acquisitions of Acthar, Ofirmev and Inomax.  Mallinckrodt FY 2015 Form 10-K, at 56.[7]

80.     The Company changed its fiscal year to a calendar year so that fiscal year 2017 would be from December 31, 2016 to December 29, 2017.  In announcements relating to the results of the first quarter ended March 31, 2017 and second quarter ended June 30, 2017, the Company reported that its net Acthar sales increased by roughly 9% and 7%, respectively, over

---

[7] While in neither year did the Company quantify the proportion of operating income stemming from Acthar, it was clearly a very significant product for the Company and its financial and operating results, especially in light of the cessation of the Company's Global Medical Imaging business by June 2015 and the declines in its Generics and Active Pharmaceutical Ingredients (API) business segment that took place after the quarter ended March 27, 2015.

net Acthar sales in the first two calendar quarters in 2016.   However, when the Company announced its third quarter 2017 results, the reported net Acthar sales were below the net sales in the same quarter in 2016.   In particular, on November 7, 2017, the Company reported that its net sales of Acthar in the third quarter ended September 29, 2017 were $308.7 million, down by 5.6% from net sales of $327.0 million during the same quarter in 2016.   Mallinckrodt 3Q2017 Form 10-Q, at 35.

81.    And ultimately, for the full fiscal year 2017, the Company reported net sales of Acthar of $1.1951 billion, an increase of only $34.7 million, or 3.0%, over net sales of Acthar over the same four quarters in 2016.   Mallinckrodt 2017 Form 10-K, at 50.   The Company reported total revenues for the year of $3.2216 billion.   Mallinckrodt 2017 Form 10-K, at 46. Although the Company proceeded not to quantify the proportion of operating income stemming from Acthar sales in 2017, Acthar clearly remained a very significant product for the Company.

82.    The Company's reported quarterly net sales of Acthar compared to the Company's total reported revenues, over the period from the quarter ended June 27, 2014 through March 30, 2018, are shown below:

| | Acthar Net Sales (in Millions of Dollars) | Total Revenue (in Millions of Dollars) |
|---|---|---|
| 06/27/2014 | 0.0[8] | 653.1 |
| 09/26/2014 | 122.9 | 673.7 |
| 12/26/2014 | 266.4 | 768.2 |
| 03/27/2015 | 228.0 | 819.0 |
| 06/26/2015 | 268.7 | 877.3 |
| 09/25/2015 | 274.2 | 778.8 |
| 12/25/2015 | 286.7 | 811.2 |
| 03/25/2016 | 248.4 | 815.8 |
| 06/24/2016 | 298.3 | 866.6 |
| 09/30/2016 | 327.0 | 887.2 |
| 12/30/2016 | 325.4 | 829.9 |
| 03/31/2017 | 271.8 | 810.9 |
| 06/30/2017 | 319.4 | 824.5 |
| 09/29/2017 | 308.7 | 793.9 |
| 12/29/2017 | 295.2 | 792.3 |
| 03/30/2018 | 243.8 | 572.6[9] |

83.     As shown in the chart, the net sales figures for Acthar suffered declines starting in the third quarter 2017 and continuing through the first quarter 2018 when compared to the same quarters in the prior years.  In particular, net Acthar sales of $327.0 million in the third quarter 2016 fell to $308.7 million in the third quarter 2017 (a 5.6% decline); net Acthar sales of $325.4 million in the fourth quarter 2016 fell to $295.2 million in the fourth quarter 2017 (a 9.3% decline); and net Acthar sales of $271.8 million in the first quarter 2017 fell to $243.8 million in

the first quarter 2018 (a 10.3% decline).  At the start of this period, in early September 2017, a

seminal report was published in the Journal of the American Medical Association ("JAMA") that

included a detailed study of prescription trends from 2011 through 2015 relating to Acthar, based

in large part on the Medicare reimbursement payment data that was first made available on

November 14, 2016.[8] Among other things, the study showed, with detailed charts, that relatively

few prescribers (in 2014, 0.2% of prescribers) in the fields of rheumatology, neurology and

nephrology accounted for much of Medicare's spending for Acthar (in 2014, 42% of all Acthar

spending).  It similarly found that despite comprising fewer than 0.5% of their total prescriptions,

Acthar accounted for more than one-third of total Medicare Part D expenditures for the frequent

specialist prescribers.  Moreover, in reply to the letter from Mallinckrodt's Chief Medical

Officer, the study authors wrote that while Acthar has been found to be effective for infantile

spasms and to treat relapses of multiple sclerosis, "the remainder of studies, as summarized in

the review cited by Dr.  Otulana, are of low quality, consisting primarily of case series, small

uncontrolled single-arm studies, and several observational studies of health care utilization." Due

to this, they wrote: "Given the preponderance of small and uncontrolled singlearm studies, we

---

[8] See Daniel M. Hartung, PharmD, MPH, et al., "Trends and Characteristics of US Medicare Spending on Repository Corticotrophin," JAMA Internal Medicine, Vol. 177, No. 11, at 1680 (Nov. 2017); accessible at: https://jamanetwork.com/journals/jamainternalmedicine/articleabstract/2653010?redirect=true.

The study was cited in Linette Lopez, "The most respected medical journal in the US just eviscerated a drug that's cost taxpayers over $1 billion," Business Insider (Sept. 12, 2017); accessible at: https://finance.yahoo.com/news/most-respected-medical-journal-us-142905444.html. Dr. Tunde Otulana, Mallinckrodt's Chief Medical Officer, wrote a response, "Uses of H.P. Acthar Gel in the Clinical Setting," that was published in JAMA Internal Medicine, Vol. 128, No. 4, at 583 (April 2018), that also included a reply by Hartung, et al. When the initial study was published, JAMA Internal Medicine also published an editorial, "New (Very High) Prices on Old Drugs," JAMA Internal Medicine, Vol. 177, No. 11, at 1568 (Nov. 2017); accessible at: https://jamanetwork.com/journals/jamainternalmedicine/articleabstract/2653007?widget=personalizedcontent&previousarticle=2653010&redirect=true.

have serious doubts that these studies will provide scientific evidence sufficient to justify use of Acthar at its current price."

84.    During the third quarter 2017 earnings call held on November 7, 2017,[9] Defendant Trudeau said that "Acthar sales growth slowed in the quarter impacted by both the comparison against 2016 with an additional selling week and a volume decline." He attributed the volume decline to the fact that "as the third quarter progressed, we saw an increasing number of prescriptions going unfilled beyond the level we had seen previously," which the Company anticipated would take time to work through, leading to the expectation that fourth quarter 2017 Acthar net sales would also be down sequentially.   And, in responding to one of the many analyst questions concerning the Company's Acthar sales, Trudeau admitted that Acthar "*continues to experience payer pressures*" and "*we expect those payer pressures to continue to be more challenging.   We expect payers to put more and more hurdles in front of patients getting reimbursement*. … The situation that we're experiencing now is this combination of both those payer pressures, plus additional the additional issue that we're seeing with these patient prescriptions going unfilled at this point."

85.    The payer pressures on Acthar sales was also discussed in ensuing quarterly earnings calls.   As previously anticipated, the Company confirmed on the fourth quarter 2017 earnings call that Acthar sales in the fourth quarter 2017 were down sequentially from those in the fourth quarter 2016 for reasons similar to those stated on the November 7, 2017 call.

86.    However, on the first quarter 2018 earnings call held on May 8, 2018,[10] while stating that the Company had "made headway in stabilizing Acthar payer access" and would

---

[9] Accessible at: https://www.nasdaq.com/aspx/calltranscript.aspx?StoryId=4121687&Title= mallinckrodt-plc-mnk-q3-2017-results-earnings-call-transcript.
[10] Accessible at: https://www.nasdaq.com/aspx/calltranscript.aspx?StoryId=4171173&Title=ma

"continue to recover from the residual Acthar patient withdrawal issues from last year,"
Defendant Trudeau admitted that there were continuing payer pressures experienced with Acthar
treatments, including when payers try to restrict the length of therapy for Acthar.  Defendant
Harbaugh further admitted that the Company's Acthar sales in the first quarter 2018 "were down
10% driven by lower volumes."

87.     Through its acquisition of the exclusive rights to develop, produce and market
Synacthen products in the United States, Questcor achieved – and Mallinckrodt later acquired – a
monopoly ACTH position for Acthar in the U.S. market.   The FTC Complaint against
Mallinckrodt and its Questcor division detailed the dramatic price increases that the companies
imposed for the price of Acthar, from $40 per vial in 2001 to over $34,000 per vial in 2017, an
85,000 percent increase, which were depicted graphically in Linette Lopez, "An Illinois city just
stepped into the war against big pharma over drug pricing," *Business Insider* (Apr. 7, 2017).[11]

---

llinckrodt-plc-mnk-q1-2018-results-earnings-call-transcript.

[11] Accessible at: http://www.businessinsider.com/rockford-sues-mallinckrodt-over-acthar-price-2017-4. A report titled "The problem with prescription drug prices" aired on 60 Minutes on May 6, 2018, which corroborates that although the bulk of the price increases for Acthar took place before the merger of Questcor into Mallinckrodt, the Company has raised the price by about $8,000 per vial since acquiring Questcor. Accessible at: https://www.cbsnews.com/news/the-problem-with-prescription-drug-prices/. The 60 Minutes reporter asked Dr. Peter Bach, who studies the cost and value of drugs at Memorial Sloan Kettering in New York, to look into Acthar. Among other things, Dr. Bach observed that while Acthar is considered to be an effective treatment for Infantile Spasms, there is no evidence that the FDA would consider convincing as to its effectiveness for the diseases that seniors are taking it. He further observed that many of the doctors who prescribed a lot of Acthar "also were getting money from the company that makes Acthar, for speaking, for consulting, for running research studies for the company, adding up to huge sums. And those doctors appear to be the ones who are most likely to also prescribe Acthar." Dr. Bach further stated: "They're using a time-tested strategy, they raise the price to a very high level and they concentrate their energies on a few doctors whom they can get to prescribe the drug. And it works great for their revenue. It doesn't help patients. And in 2015, it added up to half-a-billion dollars of expenses for Medicare."



88.     The FTC Complaint further stated that typically a course of Acthar treatment for patients with infantile spasms requires multiple vials, costing over $100,000 for one course of treatment.  Acthar is one of the most expensive drugs on the market today and it is the single most expensive drug reimbursed by both Medicare and Medicaid.

89.     The FTC Complaint asserted that Questcor had illegally purchased the U.S. rights to develop a competing drug, Synacthen Depot, and that the acquisition "stifled competition by preventing any other company from using the Synacthen assets to develop a synthetic ACTH drug, preserving Questcor's monopoly and allowing it to maintain extremely high prices for Acthar." In announcing the settlement, the FTC's Chairwoman stated: "We charge that, to maintain its monopoly pricing, it acquired the rights to its greatest competitive threat, a synthetic version of Acthar, to forestall future competition.  This is precisely the kind of conduct the antitrust laws prohibit." In addition to the $100 million payment, the FTC settlement also

required Mallinckrodt to grant a license to develop Synacthen to treat Infantile Spasms and

Nephrotic Syndrome – two of the primary uses for Acthar – to a licensee approved by the FTC.

90.     In January 2007, Defiante, a subsidiary of Sigma-Tau, had acquired from Novartis

the rights to market and distribute Synacthen in 19 countries, primarily in Europe (Austria,

Belgium, France, Germany, Greece, Ireland, Italy, Luxembourg, Poland, Portugal, Spain,

Netherlands, United Kingdom, Finland, Sweden, Denmark and Norway) and also in China and

India.  Sigma-Tau describes the uses of Synacthen on its website[12], as follows:

> Synacthen contains the active ingredient tetracosactide.  Synacthen can be
> used diagnostically to assess adrenal function and also, in some cases, as a
> treatment for certain diseases of the central nervous system.
>
> Synacthen is a synthetic protein (polypeptide) which mimics the body's
> natural adrenocorticotropic hormone (also known as corticotropin or
> ACTH).
>
> Synacthen is primarily used for diagnostic purposes to investigate adrenal
> function in cases where the adrenal cortex is suspected not to be
> functioning properly.  In some circumstances, Synacthen can also be used
> for the treatment of certain diseases of the central nervous system, namely
> acute exacerbation of multiple sclerosis (MS) and West syndrome, where
> infants with an abnormal EEG scan (a recording of brain activity) suffer
> spasms (episodes of involuntary muscular contractions).

Notably, Mallinckrodt's two marketed uses of Acthar for neurologic treatments – "multiple

sclerosis flares in adults" and "infantile spasms" – match the uses that Sigma-Tau identifies on

its website for Synacthen.

91.     The following chart summarizes the uses for which Synacthen has been approved

in certain other countries, indicating by use of an asterisk (*) the countries in which Mallinckrodt

owns the marketing rights.  The chart confirms the FTC's charge that "[i]n Europe, Canada, and

other parts of the world, doctors treat patients suffering from [the] same conditions [treated with

Acthar] with Synacthen Depot." FTC Complaint ¶ 6.

---

[12] Accessible at: http://sigma-tau.nl/en/geneesmiddelen//#synacthen.

| Country | Indications |
|---|---|
| United Kingdom | Diagnostic test for the investigation of adrenocortical insufficiency |
| Ireland | Diagnostic test for the investigation of adrenocortical insufficiency |
| Australia (*) | Diagnostic test for the investigation of adrenocortical insufficiency |
| Turkey (*) | Neurological diseases such as multiple sclerosis, hypsarrhythmia infantile myoclonic encephalopathy; rheumatic diseases; skin diseases such as pemphigus, severe chronic eczema, psoriasis, erythrodermal or pustular forms; diseases of the digestive system such as ulcerative colitis and regional enteritis; and an adjunctive therapy to increase the tolerability of chemotherapy |
| Canada (*) | 17 conditions including: acute exacerbations of multiple sclerosis, rheumatoid arthritis, lupus erythematosus, bell's palsy, ulcerative colitis, psoriatic arthritis, scleroderma, nephrotic syndrome, and adjuvant treatment in cases of acute gout |
| Germany | Infantile epilepsy (West Syndrome) |
| Romania (*) | Diagnostic test for the investigation of adrenocortical insufficiency; and treatment of acute multiple sclerosis episodes; certain types of seizures in children; rheumatic diseases; short-term treatment of conditions where corticosteroids are commonly used; skin disorders that respond to corticoids; ulcerative colitis and Crohn's disease; and adjuvant treatment in cancer patients to increase tolerability to chemotherapy |
| Singapore (*) | Anterior pituitary lobe hormone and analogue preparations |

| Country | Indications |
|---|---|
| New Zealand (*) | Diagnostic test for the investigation of adrenocortical insufficiency; and treatment of Multiple Sclerosis ("MS") and West Syndrome; rheumatic diseases; in patients showing poor gastrointestinal tolerance of oral glucocorticoids; skin diseases such as pemphigus, severe chronic eczema, erythrodermal or pustular forms of psoriasis; diseases of the gastrointestinal tract such as ulcerative colitis; regional enteritis; and as an adjuvant therapy to improve the tolerability of chemotherapy |
| Sweden | Diagnostic test for the investigation of adrenal cortex function; and treatment of neurological diseases and infantile spasms |
| Italy | Diagnostic test for adrenal cortex function; and treatment of neurological disorders including MS and infant myoclonic encephalopathy with hypsarrhythmia; in patients with poor gastrointestinal tolerance to glucocorticoids; skin diseases including pemphigus, severe chronic eczema, pustular or erythrodermal psoriasis; diseases of the gastrointestinal tract including ulcerative colitis, regional enteritis; oncology as an adjuvant to improve tolerability to chemotherapy; and nephropathies |
| Chile (*) | Adrenocortical insufficiency and for the treatment of conditions that respond to glucocorticotherapy but in which oral glucocorticoid therapy has poor gastrointestinal tolerability; neurological conditions (acute outbreaks of MS, childhood myoclonic encephalopathy with hypsarrhythmia; rheumatic diseases; dermatosis (pemphigus, severe chronic eczema, erythrodermic or pustular forms of psoriasis); oncology: as a coadjuvant to improve the tolerability of chemotherapy |
| Slovenia (*) | Diagnostic test for adrenal cortex sufficiency |
| Finland | Diagnostic test for adrenal cortex sufficiency |
| Poland | To help control the function of and stimulate the adrenal cortex; rheumatoid arthritis; chronic skin diseases such as pemphigus or exfoliative dermatitis in ulcerative colitis; Crohn's disease; MS; and in the advanced stages of cancer |
| Cuba (*) | Rheumatic diseases; poor gastrointestinal tolerability of glucocorticosteroids; neurological affections: acute outbreaks of MS, myoclonic encephalopathy, and infant with hypsarrhythmia (West Syndrome); chronic dermatoses that respond to corticosteroids such as pemphigus, dermatitis or chronic eczema severe, erythrodermic or pustular forms of psoriasis; gastrointestinal diseases including ulcerative colitis and regional Crohn's disease, and as a coadjuvant in oncology |
| Netherlands | Diagnostic test for adrenal sufficiency; acute aggravation in MS or spasm attacks (seizures of involuntary muscle contractions) in small children with a deviant EEG image (West syndrome) |

| Country | Indications |
|---------|-------------|
| Portugal | Diagnostic test for adrenal sufficiency; neurological disorders: acute exacerbations in patients with MS, childhood encephalopathy syndrome with hypsarrhythmia; rheumatic diseases: short-term therapy in pathologies for which glucocorticoids are generally indicated; in patients with reduced gastric tolerance to glucocorticoids; in cases where glucocorticoids do not allow an adequate response; skin diseases: prolonged treatment of skin disorders that respond to glucocorticoids, e.g. pemphigus, severe chronic eczema, erythrodermic forms and pustular psoriasis; diseases of the gastrointestinal tract: ulcerative colitis; regional enteritis; and oncology: as adjuvant therapy for improving tolerability to chemotherapy |
| Russia (*) | Diagnostic test for adrenal sufficiency; MS (exacerbation); infantile myoclonic encephalopathy with hyperaritis; rheumatic diseases and diffuse diseases of connective tissue (with intolerance of oral administration of SCS, inadequate efficiency of GCS); true pemphigus, true eczema of severe chronic course, psoriasis (erythrodermic or pustular form); ulcerative colitis, isolated enteritis, kidney disease (nephrotic syndrome); and as an additional means for improving the tolerability of chemotherapy in cancer disease |
| Brazil (*) | Diagnostic test for adrenal sufficiency; neurological disorders: acute exacerbations in patients with MS and childhood encephalopathy and hypoarrhythmia; rheumatic diseases: short-term therapy in pathologies for which glucocorticoids are generally indicated; in patients with reduced gastric tolerance to glucocorticoids; in cases where glucocorticoids, do not allow an adequate response; skin diseases: prolonged treatment of skin disorders that respond to glucocorticoids, for example: severe chronic eczema, erythrodermic forms and pustular psoriasis; diseases of the gastrointestinal tract: ulcerative colitis; regional enteritis; and oncology: as adjuvant therapy for improving tolerability chemotherapy |
| France | Diagnostic test for adrenal sufficiency |

92.     From the time of its acquisition of Questcor in August 2014 to the present, Mallinckrodt has not sought FDA approval for any of the uses for which Synacthen was approved in these and other countries outside the United States.  Instead, on or about June 14, 2016 – nearly two years after Mallinckrodt completed its acquisition of Questcor – Mallinckrodt submitted an Investigational New Drug (IND) application for Synacthen Depot to the FDA, seeking to pursue licensure of Synacthen solely for the treatment of DMD.

93.     Several months later, by early September 2016, the FDA granted "Fast Track" designation to Mallinckrodt's IND application for Synacthen Depot to treat DMD.   In

commenting on the designation, Mallinckrodt's Chief Scientific Officer ("CSO"), Dr. Steven Romano, said the Company was pleased with the FDA's determination and was "happy to report the first patients have been dosed in the initial Phase 1 trial." As of today, however, the use of Synacthen Depot for the treatment of DMD has not been approved, and the Company had not completed the required testing that would permit for any such approval. Instead, in a Mallinckrodt Pharmaceuticals: Investor Briefing 2017 Presentation, Research and Development, which was presented by Dr. Romano on October 4, 2017,[13] MNK-1411 (the Company's designation for Synacthen) is mentioned only in the "Development Pipeline" and the only indication for which MNK-1411 is being evaluated is for patients with DMD.

94.      DMD is not one of the indications for which Acthar has been approved by the FDA for treatment, and not one of the indications for which the Company has marketed Acthar in the United States. Thus, even if Mallinckrodt becomes successful in attaining approval of its IND application for Synacthen to treat DMD at some point in the future, that would not create any competition whatsoever with the Company's sales of Acthar for any of the uses for which Mallinckrodt has marketed Acthar in the United States.

95.      The Company's failure to seek to develop Synacthen for use in the United States to compete against Acthar – as Questcor's CSO had stated was at least part of that company's intent at the time Questcor purchased the rights to develop Synacthen in the U.S. market from Novartis in June 2013 – and potentially cause a decrease in the price of Acthar for any of its primary uses, corroborates the antitrust violations charged by the FTC and was likely the reason why the FTC required Mallinckrodt to enter into a sub-licensing agreement so that another

---

[13] Accessible at: http://phx.corporateir.net/External.File?item=UGFyZW50SUQ9NjgwMzE3fE NoaWxkSUQ9Mzg5NzA0fFR5cGU9MQ==& t=1.

company would have the ability to develop Synacthen for at least two of its primary marketed treatments – Infantile Spasms and Nephrotic Syndrome.

96.     The Company's decision not to develop Synacthen for any use that might compete with Acthar is supported by the Company's former Vice President of Global Pharmacovigilance ("Former VP"), who served in that position at Mallinckrodt from early January 2013 until September 30, 2016.  Former VP also served as the Acting Chief Medical Officer from approximately mid-2015 to early 2016.  Former VP initially reported to Tom Smith, who was Mallinckrodt's Chief Medical Officer until he left the Company.  Former VP thereafter reported primarily to the Company's Chief Scientific Officers, Mario Saltarelli until he left the Company and then Steven Romano, but during the latter portion of Former VP's tenure with the Company, he reported to a new Chief Medical Officer, Tunde Otulana.

97.     Former VP noted that Synacthen was acquired from Novartis by Questcor, and was on the market in over 50 countries around the world, other than the United States, when Questcor was acquired by Mallinckrodt.  While the outside word was that Mallinckrodt was going to develop Synacthen for some indication, Former VP believes, based on the positions held with the Company and interactions with others at the Company, that Mallinckrodt's management "were careful quite honestly because they didn't want it to compete with Acthar because the pricing scheme (for Synacthen) was considerably different."  At the time, Synacthen was basically a drug costing only a few dollars a vial in the overseas market for indications that overlapped with Acthar.  Former VP believes that had another company developed Synacthen for the U.S. market, it would have become widely used given its very similar amino acid sequences and because it would have been much cheaper than Acthar.  That is why, according to Former

VP, Mallinckrodt management "dragged their feet.  They were going to discuss it to death.  They put very little effort into developing Synacthen in the US."

98.     Former VP further noted that Mallinckrodt had to submit dossiers by certain timeframes in order to satisfy the license agreement with Novartis, otherwise Novartis would have had the option to take the drug back.  That led to Mallinckrodt submitting an IND but, according to Former VP, there were few resources attached to it. Former VP noted "[s]o, to call it an active development program would have been a gross overstatement."

99.     Former VP further related that while Synacthen development was not a priority at Mallinckrodt, any decisions on its development ultimately resided with the Mallinckrodt Executive Committee.  The Chief Scientific Officer would have had significant input into Synacthen development, and CEO Trudeau would have to approve any such plan.  While Former VP and others (including Mario Saltarelli, the CSO for a while; the Head of Project Management; the Head of Research and Development; and various clinical team leaders) had meetings regarding Synacthen, ultimately Mallinckrodt devised a game plan and settled on an indication for DMD in order to submit an IND (Investigational New Drug Application) and then put together a program to hit a timeline to submit the NDA (New Drug Application) for FDA approval.

100.     Former VP also stated that the scientific group made presentations about the Synacthen development plans to the Mallinckrodt Executive Committee.  But overall, there were not very many resources, i.e., people devoted to Synacthen development, especially compared to Acthar.  Thus, in Former VP's view, given that Synacthen was a drug with lots of approval in many places and a long history overseas, Mallinckrodt should have been able to put together a program tailored to the FDA for submission within a few months of an IND for several

indications – in addition to the one that was submitted for DMD – including some that may have competed with Acthar, rather than waiting for nearly two years to file the IND for the one indication (DMD) with the FDA.

101.    The Company's intent to maintain its unlawful monopoly of ACTH medications is further borne out by Mallinckrodt's June 2015 settlement of allegations made in a complaint filed against Questcor by another one of the bidders for the Synacthen license.  *Retrophin, Inc. v. Questcor Pharmaceuticals, Inc.,* No. 8:14-cv-00026-JLS-JPR (C.D. Cal., filed Jan. 7, 2014) (the "Retrophin Complaint").  The Retrophin Complaint alleged that in June 2013, Retrophin was poised to challenge Questcor's ACTH Acthar monopoly, stating that it (a) had negotiated an agreement to purchase the U.S. rights to Synacthen from Novartis, (b) "planned to obtain FDA approval to sell Synacthen in the US to and compete head to head against Questor [sic] by undercutting Questcor's price for Acthar," and (c) was scheduled to sign a purchase agreement on June 11, 2013.  Retrophin Complaint ¶¶ 4-6.  However, as alleged by Retrophin, Questcor swooped in at the last minute and acquired the rights to Synacthen.

102.    Rather than seeking to challenge Retrophin's allegations on the merits, on June 4, 2015, pursuant to a Confidential Settlement Agreement and Release, Mallinckrodt, through Questcor Pharmaceuticals, which was now a wholly-owned and operated subsidiary, agreed to settle the litigation.  Under the terms of the Settlement Agreement, Questcor paid Retrophin $15.5 million in exchange for a release of all claims by Retrophin.[14]

103.    While not competing in any way with any of the treatment indications for which Acthar is sold in the United States, Mallinckrodt's development of Synacthen Depot to treat DMD would, however, appear to meet certain terms in the License Agreement that Questcor

---

[14] *See* https://www.sec.gov/Archives/edgar/data/1438533/000119312515215608/d93850 4d8k.htm.

entered into with Novartis in 2013, when it purchased the rights to develop and market Synacthen Depot in the U.S. market.  Under the License Agreement, which has an Effective Date of June 11, 2013, Questcor was required to pay Novartis $60 million on the Effective Date, and to pay $25 million on each of the first three anniversary dates (*i.e.,* June 11, 2014, 2015 and 2016), which payments were required to be secured by a $75 million bank guarantee.  These required payments, totaling $135 million, were required to be paid even if the License Agreement was later voided for antitrust reasons.

104.   The License Agreement further provided – without disclosing the amounts of payments in the published version of the Agreement – that Questcor was required to make "milestone payments" upon each subsequent anniversary of the Effective Date until such time that Questcor (or any affiliate or sub-licensee) secured the first approval of a product derived from Synacthen Depot from the FDA for use in the United States, when it would owe other types of royalty payments.  As stated in the License Agreement, Novartis could require a termination of the License Agreement if Questcor did not make any of the required payments and did not reach a set of "Development Milestones" with certain time periods that are not specified in the public version of the Agreement.

105.   The development to the filing of this Complaint – nearly four years after Mallinckrodt acquired the rights to develop Synacthen Depot in the U.S. market – of just one application to the FDA for a treatment that would not compete with Mallinckrodt's sales of Acthar was a major part of Mallinckrodt's unlawful, yet undisclosed scheme to violate U.S. antitrust laws and charge increasing prices for Acthar.  The Company developed Synacthen Depot for only the treatment of DMD so that it would have no effect whatsoever on Mallinckrodt's ability to charge highly excessive prices for its primary Acthar treatment

indications – Infantile Spasms, Nephritic Syndrome, Rheumatology Related Conditions, and Multiple Sclerosis.  Indeed, it is telling that when the FTC agreed to settle its antitrust claims against Mallinckrodt, it required the Company to license to another company the rights to develop Synacthen Depot for the treatment of Infantile Spasms and Nephritic Syndrome, two of its primary sales indications.

106.    Pursuant to the FTC settlement, on or about July 16, 2017, Mallinckrodt granted a license to West Pharmaceuticals, giving it the right to develop and pursue possible FDA approval of Synacthen Depot in two indications – Infantile Spasms (IS) and Nephritic Syndrome (NS), along with the exclusive rights to the Synacthen trademark in the U.S. Under its license agreement with West, Mallinckrodt retained the rights to continue manufacturing and marketing Synacthen to patients in other countries around the world, where the Company already has rights, and it can also develop the product for all other indications in the United States.  To date, the Company has not sought FDA approval for any other uses of Synacthen.

### D.    Defendants' False and Misleading Statements and Omissions

107.    Defendants made false and misleading statements and omitted to disclose facts that made their statements materially misleading, about the Company's use of its monopolistic position with regard to Acthar throughout the Relevant Period.   The misstatements and omissions, which are identified below along with the reasons why the statements and omissions misled the market, related to two primary issues: (1) the Company's competitive position and business plans with regard to Acthar; and (2) the extent of Acthar sales that were reimbursed by Medicare and Medicaid.

### 1.    Defendants' Statements Concerning the Company's Competitive Position and Business Plans With Respect to Acthar Were False and Materially Misleading

108.    The Relevant Period begins on July 14, 2014, when Questcor and Mallinckrodt

each filed a joint definitive proxy statement with the SEC in anticipation of the shareholder votes

on the pending merger.  In no portion of the joint proxy statement did either company disclose

the existence of the FTC investigation or subpoena received by Questcor from the FTC on June

11, 2014.  Rather, the definitive proxies listed a litany of risk factors for Mallinckrodt concerning

Acthar and Synacthen, as follows:

> These factors include risks and uncertainties related to, among other things:
> general economic conditions and conditions affecting the industries in which
> Mallinckrodt and Questcor operate; the commercial success of Mallinckrodt's and
> Questcor's products, including H.P. Acthar® Gel; Mallinckrodt's and Questcor's
> ability to protect intellectual property rights; the parties' ability to satisfy the
> merger agreement conditions and consummate the merger on the anticipated
> timeline or at all; the availability of financing, including the financing
> contemplated by the debt commitment letter, on anticipated terms or at all;
> Mallinckrodt's ability to successfully integrate Questcor's operations and
> employees with Mallinckrodt's existing business; the ability to realize anticipated
> growth, synergies and cost savings; Questcor's performance and maintenance of
> important business relationships; the lack of patent protection for Acthar, and the
> possible FDA approval and market introduction of additional competitive
> products; Questcor's reliance on Acthar for substantially all of its net sales and
> profits; Questcor's ability to continue to generate revenue from sales of Acthar to
> treat on-label indications associated with nephrotic syndrome, multiple sclerosis,
> infantile spasms or rheumatology-related conditions, and Questcor's ability to
> develop other therapeutic uses for Acthar; volatility in Questcor's Acthar
> shipments, estimated channel inventory, and end-user demand; an increase in the
> proportion of Questcor's Acthar unit sales comprised of Medicaid-eligible
> patients and government entities; Questcor's research and development risks,
> including risks associated with Questcor's work in the areas of nephrotic
> syndrome and Lupus, and Questcor's efforts to develop and obtain FDA approval
> of Synacthen Depot; Mallinckrodt's ability to receive procurement and production
> quotas granted by the DEA; Mallinckrodt's ability to obtain and/or timely
> transport molybdenum-99 to Mallinckrodt's technetium-99m generator
> production facilities; customer concentration; cost-containment efforts of
> customers, purchasing groups, third-party payors and governmental organizations;
> Mallinckrodt's ability to successfully develop or commercialize new products;
> competition; Mallinckrodt's ability to achieve anticipated benefits of price
> increases; Mallinckrodt's ability to integrate acquisitions of technology, products
> and businesses generally; product liability losses and other litigation liability; the
> reimbursement practices of a small number of large public or private issuers;
> complex reporting and payment obligations under healthcare rebate programs;

changes in laws and regulations; conducting business internationally; foreign exchange rates; material health, safety and environmental liabilities; litigation and violations; information technology infrastructure; and restructuring activities.

109.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose material adverse facts relating to Mallinckrodt's future business prospects and operations which were then known to Defendants and/or recklessly disregarded by them.  Specifically, Defendants failed to disclose that Acthar's financial viability was largely dependent upon the continuation of monopolistic and anticompetitive actions that Mallinckrodt intended to take, which were aimed at preventing a synthetic version of ACTH from entering the U.S. market, including specifically that Mallinckrodt did not intend to develop Synacthen for any uses that might compete with Acthar sales.

110.     The statements referenced above were also materially false and/or misleading because Defendants failed to disclose that on June 11, 2014, approximately two months before the scheduled shareholder votes on the merger and one month prior to the issuance of the joint proxy statement, Questcor had received a subpoena and Civil Investigative Demand ("CID") from the FTC, seeking documentary materials and information pertaining to an FTC investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen from Novartis violates the antitrust laws.  Questcor was clearly aware of the subpoena and CID from the FTC.  It was sent to Questcor and the company received it.

111.     As for Mallinckrodt, it claimed in the joint proxy statement that its board of directors, *after consultation with the Company's "management, legal advisors, financial advisors and other representatives*," considered many factors in making its determination that the Merger Agreement and other transactions contemplated by the Agreement were fair to and in

the best interests of Mallinckrodt and its shareholders.   Joint Proxy Statement at 105-106. Mallinckrodt's board further indicated that its recommendation to shareholders was based on Strategic and Financial Considerations, the Merger Agreement, Implied Ownership, the Opinion of its Financial Advisor, ***the Recommendation by Mallinckrodt Management***, Governance, Familiarity with the Industry and Businesses, ***and Due Diligence***.   On the latter point, the Joint Proxy Statement (page 107) cited to the scope of the Due Diligence that had been conducted as a reason for the merger recommendation, as follows:

> The scope of the due diligence investigation of Questcor conducted by Mallinckrodt management and outside advisors and consultants (***which included in-depth*** reviews of organizational, operational, financial, commercial, ***regulatory, legal***, employee and other matters), and the results of that investigation.

112.    Indeed,   even   after   the   Mallinckrodt-Questcor   merger   was   completed, Mallinckrodt's management continued to tout the due diligence it had performed in advance of presenting the proposed merger with Questcor to Mallinckrodt shareholders.   On September 8, 2014, in response to an analyst question, Defendant O'Neill, then-President of Mallinckrodt's Autoimmune and Rare Diseases operations, whose jurisdiction included Acthar, stated that the Company had conducted "across the board" due diligence regarding Questcor and Acthar, "from the way the product is manufactured, to the way the product is sold, to the way the product is actually positioned for reimbursement." Thus, it is inconceivable that Defendants were not aware that the FTC had already started an investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen from Novartis violated the antitrust laws, which also would have put Mallinckrodt on notice that its actions with respect to the development of Synacthen would be the subject of the on-going investigation.

113.     Nonetheless, Defendants failed to disclose in the joint proxy statement, or at any other time prior to the consummation of the merger, the fact that the FTC had issued a subpoena and CID for documents and commenced an investigation into these subjects.   As Gretchen Morgenson later wrote in a column in the *New York Times* after the FTC settlement was announced: "as Mallinckrodt shareholders weighed whether to approve the deal [with Questcor], they received company filings that detailed the risks in the acquisition.   Nowhere did the FTC subpoena come up – it was the proverbial dog that did not bark." In fact, the pendency of the FTC's investigation went undisclosed for another five and one-half months, even though in the interim Mallinckrodt filed one quarterly Form 10-Q, and nine (9) separate Form 8-K reports.

114.     The definitive proxy statement was also false and misleading because, while the companies noted "Questcor's performance and maintenance of important business relationships" and "Questcor's efforts to develop and obtain FDA approval of Synacthen Depot" constituted potential risks facing Questcor, in the spring of 2014, which was ***before*** the joint proxy statement was issued, ***the sole worldwide manufacturer of Synacthen and Synacthen Depot had informed Questcor that it would cease manufacturing the product in April 2016, due to a planned decommissioning of its sole production site***, which would require Questcor and Mallinckrodt to identify and initiate production with a new manufacturer.

115.     This fact came to light only after Mallinckrodt was heavily criticized for engaging in alleged price gouging in Canada when, starting in early 2015, Mallinckrodt increased the price of Synacthen products it was selling in Canada.   In particular, in January or February 2015 – approximately six months after the Questcor was merged into Mallinckrodt – the Company raised the price of Synacthen Depot (Cosyntropin) in Canada from C\$33.66 per vial to C\$801.19 per vial.   As a result, the cost of the required six-week treatment for Infantile Spasms (also called

West Syndrome) "skyrocketed from about C$750 to almost C$17,000."[15] The September 24, 2015 article in Epilepsy Ontario further reported that the most effective treatment for Infantile Spasms in Canada is Synacthen Depot (Cosyntropin), and that without prompt and effective treatment, an infant will develop severe neurological and cognitive impairments.  Dr. Carter Snead, a pediatric neurologist, was quoted in the article as saying that the 2,000 percent price increase on a medication to treat Infantile Spasms was "predatory behavior" and that Mallinckrodt had done "absolutely nothing to justify this huge price increase."

116.    Other articles followed.  An article by Rebecca Robbins, entitled "How a price hike for a drug for infants with epilepsy drove an uproar," was published by Stat News on November 17, 2015.[16] The article stated that others had also written about the 2,000 percent price

---

[15] *See* Deron Hamel, "2,000% price hike on infantile spasms medication 'predatory behaviour': Neurologist," Epilepsy Ontario (Sept. 24, 2015), accessible at: http://epilepsyontario.org/2000-price-hikeon-infantile-spasms-medication-predatory-behaviour-neurologist/. The article reported that Toronto's Hospital for Sick Children and the Ontario Drug Benefit program negotiated the price down to $680 per vial, so that the treatment course would cost $14,280 rather than the full almost $17,000. Synacthen is distributed in Canada pursuant to a distribution agreement with Valeo Pharma Inc., a Canadian specialty pharmaceutical company. *See* Valeo Pharma announces Distribution Agreement for Synacthen® Depot in Canada (Feb. 19, 2015), accessible at: https://www.prnewswire.com/news-releases/valeo-pharmaannounces-distribution-agreement-for-synacthen-depot-in-canada-292687721.html.

Mallinckrodt also raised Synacthen prices in other countries in which the Company held the exclusive rights to develop, market and sell Synacthen and Synacthen Depot. For example, Ruud Helwig, General Manager, International, for Mallinckrodt ARD, wrote a letter dated January 19, 2015, to Alltherm Sa, concerning "Important changes" with respect to Synacthen and Synacthen Depot products then being sold in Switzerland. "The objective of this letter is to inform you of the need to increase the price of Synacthen & Synacthen Depot (a synthetic ACTH analogue) to ensure the long-term supply of the product for patients in Switzerland." Among other things, the letter further stated that long-term supply concern arose from notice given by the current sole worldwide manufacturer of Synacthen & Synacthen Depot, of its inability to supply the product beyond April 2016 due to a planned manufacturing site decommission. The letter is accessible at: http://sgedssed.ch/fileadmin/files/6_empfehlungen_fachpersonen/65_medikamenteninfos/Info_Synacthen_price_change_letter_2015.pdf.

[16] Accessible at: https://www.statnews.com/2015/11/17/infants-epilepsy-drug-price.

hike for the Synacthen product that Mallinckrodt was then selling in the Canadian market.  CBC News issued a story on November 16, 2015, entitled "2,000% price hike for infant seizure drug called 'absurd.'"[17]   The written posting of the report noted that because the price hike was so high, from C\$33.05 per vial to C\$680 per vial, Alberta Health officials delisted it in July 2015, although it could still be provided on a case-by-case basis, and health officials in three other provinces reported similar increases.

117.     In an apparent response to these and the other articles, Mallinckrodt issued a news release on November 17, 2015, which publicly disclosed the following:

> ***In the spring of 2014 the existing European manufacturer of the products announced it would cease manufacturing the product in April 2016 – requiring Mallinckrodt to identify and initiate production with a new manufacturer.***

Thus, whereas Questcor and Mallinckrodt knew of the fact that the sole worldwide manufacturer of Synacthen and Synacthen Depot would be unable to supply the product beyond April 2016 due to a planned manufacturing site decommission, they merely reported as a risk that Questcor might not be able to maintain "important business relationships" and that it faced risks surrounding its "efforts to develop and obtain FDA approval of Synacthen Depot."

118.     In addition to the false statements in and omissions from the joint proxy statement issued July 14, 2014, Defendants made a number of false and materially misleading statements regarding the Company's competitive position pertaining to Acthar.  On November 25, 2014, Mallinckrodt filed its Annual Report on Form 10-K for the fiscal year ended September 26, 2014 with the SEC (the "2014 Form 10-K").  The 2014 Form 10-K represented that Acthar "***has limited direct competition due to the unique nature of the product*" and that its "*commercial durability therefore relies partially upon product formulation trade secrets, confidentiality***

---

[17] Accessible at: http://www.cbc.ca/news/health/infantile-seizures-drug-1.3318183.

*agreements and trademark and copyright laws*." The same statements were included in the

Company's 2015 Form 10-K and 2016 Form 10-K.  The 2014 10-K also stated:

> [F]ollowing our acquisitions of Cadence and Questcor, both of which were completed in fiscal 2014, we expect that a small number of products, most notably Acthar and to a lesser extent, Ofirmev, will represent a significant percentage of our net sales.  Our ability to maintain and increase net sales from these products depends on several factors, including:
>
> - our ability to increase market demand for products through our own marketing and support of our sales force;
> - our ability to implement and maintain pricing actions and continue to maintain or increase market demand for these products;
> - our ability to maintain confidentiality of the proprietary know-how and trade secrets relating to Acthar;
> - our ability to maintain and defend the patent protection and regulatory exclusivity of Ofirmev;
> - our ability to continue to procure a supply of Acthar and Ofirmev from internal and third-party manufacturers in sufficient quantities and at acceptable quality and pricing levels in order to meet commercial demand;
> - our ability to maintain fees and discounts payable to the wholesalers and distributors and group purchasing organizations, at commercially reasonable levels;
> - whether the Federal Trade Commission ("FTC"), Department of Justice ("DOJ") or third parties seek to challenge and are successful in challenging patents or patent-related settlement agreements or our sales and marketing practices;
> - warnings or limitations that may be required to be added to FDA-approved labeling;
> - the occurrence of adverse side effects related to or emergence of new information related to the therapeutic efficacy of these products, and any resulting product liability claims or product recalls; and
> - our ability to achieve hospital formulary acceptance, and maintain reimbursement levels by third-party payors.
>
> Moreover, net sales of Acthar may also be materially impacted by the decrease in the relatively small number of prescriptions written for Acthar as compared to other products in our portfolio, given Acthar's use in treating rare diseases.  Any disruption in our ability to generate net sales from Acthar could have an adverse impact on our business, financial condition, results of operations and cash flows.

Substantially the same statements were made in the Company's 2015 Form 10-K and 2016 Form

10-K.

119.    Defendants made similar statements about the lack of direct competition for Acthar and its commercial durability at other points, as well, during the Relevant Period.

120.    For instance, on October 6, 2015, Mallinckrodt held a conference call with analysts and investors.  During that call, Defendant Trudeau addressed the competitive situation for Acthar:

> This seems like an appropriate moment for me to pause and say a few words about recent speculation related to the competitive environment for Acthar.  When we evaluated the acquisition of Acthar, we dug deeply into the product, the market, existing therapies and the potential for additional competition.  ***We concluded then that Acthar was a unique asset with significant durability and great potential for substantial long-term volume growth, and we continue to believe that now.***
>
> It is important to remember a couple of things.  One, Acthar is a very complex product, a naturally derived mixture of organic components.  Though used in a fairly broad spectrum of indications, it's prescribed for relatively small number of patients with complicated condition, and often prescribed only after other treatments have failed or patients can no longer tolerate other therapies.  As such, many treatments and therapies already compete with Acthar.
>
> And two, competition will always exist for any product in any market, and Acthar is no different.  ***Based on what we know about the unique characteristics of Acthar itself, the complicated regulatory environment for complex, naturallyderived products, and the lack of successful market precedent, we continue to believe that the path to market for a direct competitor to Acthar is uncertain and likely to be potentially long***.  The competitive situation will continue to evolve, but as it does, we will continue to focus on the leverage that we know will grow Acthar volume and concentrate on execution.
>
> The product is performing well, logging the highest net sales in Acthar's history in the third quarter.  And we believe there is still a tremendous opportunity to drive additional Acthar volume.  Since today, roughly only about 3% of patients who could potentially benefit from Acthar now receive it.

121.    When asked to comment during the same call on potential competition to Acthar, Defendant Trudeau downplayed competition, adding, "I think what we can summarize is that you can see it's a very complex environment ***with tremendous barriers and lots of unknown information***.  I think, again, just to reemphasize, we feel quite confident in the durability of Acthar regardless of where the competitive environment evolves to."

122.    The above statements were materially false and misleading because Acthar's "limited direct competition" and "commercial durability" was due to Mallinckrodt's anticompetitive practices in preventing Synacthen from reaching the U.S. market, particularly for treating diseases for which Acthar was currently being prescribed, and Defendants knew or recklessly disregarded the fact that Mallinckrodt had acted with the purpose and effect of foreclosing competition in violation of the antitrust law, thereby continuing to increase the price of Acthar, and these actions could not be sustained once challenged.  Indeed, the Company did not follow up on any indication for Synacthen other than for DMD – a use that would not in any way compete with its Acthar franchise or any of its approved and marketed treatment indications – despite that it was marketing and selling Synacthen in Canada and many other foreign countries for the treatments identified in the chart above as well as for Infantile Spasms in Canada, as identified above.  The falsity of Defendants' statements above is further demonstrated by the fact that after Acthar sales declined in the third quarter 2017, the fourth quarter 2017 and the first quarter 2018, compared to Acthar sales in the comparable quarters in the prior years, Defendant Trudeau ***admitted*** during the earnings call held on May 8, 2018, that Acthar "has competition on every single one of its indications today."[18]

### 2.    The Inadequate Disclosure of the Mallinckrodt's Anticompetitive Behavior and the Evidence It Was Aware of the Pending FTC Litigation

123.    With regard to all of the false and misleading statements identified above, the Company's belated disclosures that it was under investigation for violations of federal antitrust law by the FTC in the 2014 Form 10-K, filed on November 25, 2014, and in subsequent Forms 10-K, did not constitute a sufficient disclosure to the market of the actions that Mallinckrodt was

---

[18] Accessible at: https://www.nasdaq.com/aspx/calltranscript.aspx?StoryId=4121687&Title= mallinckrodt-plc-mnk-q3-2017-results-earnings-call-transcript.

undertaking as a result of its intended suppression of any Synacthen-based competition for its Acthar franchise.  Instead, the 2014 Form 10-K merely stated:

> Questcor has received a subpoena and a Civil Investigative Demand ("CID") from the Federal Trade Commission ("FTC") seeking documentary materials and information regarding the FTC's investigation into whether Questcor's acquisition of certain rights to develop, market, manufacture, distribute, sell and commercialize Synacthen Depot from Novartis violates antitrust laws.  We are in the process of responding to each of the subpoenas [from the DEA, FTC and U.S. Attorney's Office] and the CID and we intend to cooperative fully in each such investigation.

Mallinckrodt 2014 Form 10-K, at 113.

124.    The Company repeated this disclosure and statement of its intention to cooperate in each of the Forms 10-K for the 2015 and 2016 fiscal years, adding that the Company was not aware of any "*existing or pending litigation*" in connection with the investigations and that an ultimate resolution "*could have* a material negative impact on its [Mallinckrodt's] financial condition, results of operations and cash flows." *See* Mallinckrodt 2015 Form 10-K, at 118; Mallinckrodt 2016 Form 10-K, at 112.  This statement of a risk facing the Company was not sufficient to provide the market with actual information about the Company's intent and internal actions, which are summarized above, and reflect Mallinckrodt's continuing course of conduct in violation of the antitrust laws.

125.    Lastly, as alleged above, the FTC filed its Complaint and the Consent Decree with the U.S. District Court for the District of Columbia on January 18, 2017.  The Company's disclosures made on November 29, 2016, in the Company's 2016 Form 10-K stated that the Company was "not aware of any existing or pending litigation in connection with these investigations." But, by then, all indications are that the FTC would have informed Mallinckrodt that it was pursuing the investigation onto a more serious level, and it is difficult to imagine that

the Company was not in negotiations with the FTC for at least several months in advance of the January 18, 2017 FTC settlement and fine.

126.    Among other things, the FTC's litigation processes can be gleaned by reviewing the FTC Operating Manual ("Operating Manual" or "FOM").   The Operating Manual "is distributed to all professional and designated support staff in the Commission, and covers most Commission activities." FOM Chapter One, §§ .1.1. & .1.2.1.  FTC staff is advised "to follow the procedures outlined in the OM [Operating Manual] unless circumstances warrant modification." FOM Chapter One, §.1.1.

127.    The FOM provides that "[t]he proposed respondent will ordinarily be contacted during the course of the investigation to obtain information and should be advised of the general nature of the inquiry including the statutes and the alleged violations involved."  FOM Chapter Three § .3.6.1.  It further provides that "[o]rdinarily, the use of investigational subpoenas or CIDs contemplates the convening of an investigational hearing with testimony under oath and the preparation of a transcript." FOM Chapter Three § .3.6.7.5.1. "For each type of CID, the Commission is required to state in the demand, 'the nature of the conduct constituting the alleged violation … and the provisions of law applicable to such violation.'" FOM Chapter Three, § .3.6.7.5.3.

128.    The Operating Manual also specifically directs the procedures to be followed in "negotiations toward a consent resolution before the filing of a complaint."It is the policy of the Commission to make this opportunity [to settle] available during or upon completion of the investigation … as well as during adjudication…." FOM Chapter Six, § .3.  The Operating Manual makes clear that FTC staff must have adequately developed the facts before offering a consent agreement:

Before offering a consent agreement to a proposed respondent or submitting to the Commission at the conclusion of an investigation a settlement offer by proposed respondent, the staff should have developed sufficient facts to determine:

(1)  the nature and gravity of the practices and of any violations that result;
(2)  the appropriate complaint charges and order provisions; and to conclude;
(3)  whether the public would be adequately protected by the proposed relief.

FOM Chapter Six, § .3.1.

129.    This means that before the FTC staff could have proposed or considered a consent agreement with Mallinckrodt, it must have "developed sufficient facts" bearing on the seriousness of the antitrust violation emanating from Questcor's acquisition of the rights to Synacthen and Mallinckrodt's continuing anticompetitive practices in connection with Acthar.

130.    The negotiation process also involves significant involvement by the professional leadership of the FTC, and accompanying delay.  The Operating Manual directs that "[i]t is advisable for the staff not to engage in intensive consent order negotiations without prior consultation with the Assistant Director, Regional Director, program advisor in BCP [Bureau of Consumer Protection], or Assistant to the Director in BC [Bureau of Competition]." FOM, Chapter Six, § .3.2.  Further, when negotiations result in agreement between the staff and proposed respondent, the proposed agreement is to be submitted to the Director of the Bureau of Competition for review prior to execution.  FOM Chapter Six, § .9.1.

131.    Upon approval of the draft and execution of an agreement by staff, copies of the signed consent agreement, supporting memorandum and other necessary material shall be forwarded to the Director of the Bureau of Competition within 30 calendar days, and any action by the Bureau of Competition on the staff recommendation shall be completed within 35 calendar days.  FOM Chapter Six, § .9.1.  The staff then forwards a consent agreement to the Commission for review and approval.  FOM Chapter 6, § .10.

132.    Accordingly, as a matter of FTC practice, the proposed complaint and consent order would have been provided to Mallinckrodt, in draft and then in final form, well in advance of the announcement of its public filing on January 18, 2017.  The complaint and consent decree include detailed findings, provide for a $100 million fine, and require that Mallinckrodt license the rights to develop Synacthen for treatments of Infantile Spasms and Nephrotic Syndrome – all of which must have been the subject of extensive negotiations between the FTC and Mallinckrodt.

133.    All of this indicates that Mallinckrodt and the Officer Defendants must have been aware of this pending litigation by the time of the filing of the 2016 10-K report on November 29, 2016 – a mere fifty (50) days before the filing of the FTC complaint and the Company's consent decree.  Thus, Defendants' statement in the Form 10-K issued on November 29, 2016, that the Company "*is not aware of any* existing or *pending litigation in connection with these investigations*" was materially false and misleading for this reason.

### 3.    The Company's and Defendant Trudeau's Statements Concerning the Extent of Acthar Sales Reimbursed by Medicare and Medicaid Were False and Materially Misleading

134.    A significant metric viewed by investors in Mallinckrodt during the Relevant Period related to the percentage of Acthar sales that were reimbursed by private insurers versus the percentage of sales that were reimbursed by Medicare and Medicaid.  Indeed, in the risk section of the Joint Definitive Proxy for the proposed merger of Questcor into Mallinckrodt, issued on July 14, 2014 – the start of the Relevant Period – the companies included, as a potential risk factor, "an increase in the proportion of Questcor's Acthar unit sales comprised of Medicaid-eligible patients and government entities," which indicated that having more

government reimbursements compared to private insurer reimbursements would be detrimental to the Company's business and future prospects.

135.   On October 6, 2015, Mallinckrodt held a guidance call with investors.  During that call, Jerry Gerberry of Leerink Partners asked the question: "What is your Acthar exposure to Medicare?" In response, Defendant Trudeau asserted:

> So with regards to your question on Medicare exposure to Acthar, a couple of things.  One, *if we look at our overall business, the combined proportion of our business that goes through Medicare and Medicaid combined it's about a quarter of our business, roughly.  Acthar is maybe a little higher than that*.  But in general, our business is about a quarter.

136.   This statement was false when made because it misrepresented in a material way the total percentage of Acthar sales attributable to Medicare and Medicaid.  As later revealed in data released for the years 2011 through 2015 by the Centers for Medicare and Medicaid Services ("CMS") on November 14, 2016, and in a Citron Research Report of November 16, 2016, the Company's Acthar sales that were reimbursed by Medicare and Medicaid was over *61*% of the Company's total 2015 Acthar sales, it had been over *60*% of Questcor's and the Company's total 2014 Acthar sales, and it had been over *45*% of Questcor's total 2013 Acthar sales.  Each of these figures was materially higher than the 25% and "maybe a little higher than that" that Trudeau stated on October 6, 2015.

137.   In 2015, prescription drug spending outpaced all other health care services and drove up healthcare spending overall.  There was growing controversy over the rising prices of pharmaceuticals – the issue was the focus on Congressional hearings and a hot topic on the presidential campaign trial.   In November 2015, U.S. Senators Susan Collins and Claire McCaskill launched an investigation into companies that purchased medicines and then raised prices to previously unforeseen levels.  Valeant Pharmaceuticals and Turing Pharmaceuticals

were two of the companies targeted by these senators.  On December 9, 2015, a hearing on drug prices was held in order to examine the huge spikes in drug prices that were seemingly unrelated to the research and development costs of these drugs.  At the same time, several U.S. House of Representative members formed the Affordable Drug Pricing Taskforce to examine drug pricing.

138.    Due to this outcry, the CMS created an online dashboard to increase transparency and address affordability of prescription drugs.  As stated on the CMS website: "The 2015 Medicare Drug Spending Dashboard is an online interactive tool that presents drug spending and utilization information on certain Medicare Part B drugs (drugs administered in doctors' offices and other outpatient settings) and Medicare Part D drugs (drugs patients generally administer themselves)."  For the Dashboard, CMS identified 80 drugs using 2015 data that met certain criteria: 40 drugs provided through the Medicare Prescription Drug Program under Part D and 40 drugs administered by physicians and other professionals in the Medicare fee-for-service program under Part B.  The following criteria was used to select the drugs: the drug is ranked in the top 15 in terms of total program spending (for either Part B or D); the drug is associated with a high annual per user spending based on claims data analyses (i.e., greater than $10,000 per user) and is ranked in the top 15 by overall program spending (and not already selected by the prior criterion); or the drug is ranked among the top 10 high unit cost increases (and not already selected by the either of the prior two criteria).  Acthar was one of the products that met the CMS's criteria and was included in the study.

139.    The CMS data from this initiative was first presented publicly in data issued on November 14, 2016.

140.    A chart titled Medicare Drug Spending 2011-2015 was included in the CMS data,[19] which showed dramatic increases for Medicare spending for Acthar from 2011 through 2015, as follows.

| 2011 | H.P. Acthar | $49,456,910.88 |
|------|-------------|----------------|
| 2012 | H.P. Acthar | $141,451,607.58 |
| 2013 | H.P. Acthar | $262,581,602.41 |
| 2014 | H.P. Acthar | $391,189,652.63 |
| 2015 | H.P. Acthar | $503,999,371.37 |

141.    The CMS data relating to Acthar further showed that Total Annual Spending Per User had increased over the same time period:

| |
|---|
| $57,979.97 |
| $89,356.67 |
| $108,013.82 |
| $133,420.75 |
| $162,370.93 |

142.    Thus, as reported in a Business Insider article of February 16, 2017, Medicare spent an average of $162,371 on each Acthar patient in 2015.[20] The article further reported that while Medicare Part D spent over $5 billion on Acthar in 2015, which constituted reimbursement for only 3,104 patients.

143.    CMS similarly reported on Medicaid spending data.  There, a chart entitled Medicaid Drug Spending 2011-2015 included the following information under the heading Total Spending:

---

[19]   The CMS data is accessible at: https://www.cms.gov/Research-Statistics-Data-and-Systems/StatisticsTrends-and-Reports/Information-on-Prescription-Drugs/2015Medicare.html. Data relating to Acthar appears on lines designated as H.P. Acthar. They appear, for instance, in the tab for 2011 through 2015 drug spending by Medicaid in lines 163 through 168.

[20]   Lopez, Linette, "We dug into the drug company Martin Shkreli sold out to the feds, and man is it ugly," Business Insider, Feb. 16, 2017 (accessible at: http://www.businessinsider.com/achtar-drug-showsflaws-in-drug-pricing-payment-system-2017-2).

| 2011 | H.P. Acthar | $40,007,316.65 |
|------|-------------|----------------|
| 2012 | H.P. Acthar | $57,409,698.41 |
| 2013 | H.P. Acthar | $83,938,623.82 |
| 2014 | H.P. Acthar | $126,837,119.09 |
| 2015 | H.P. Acthar | $144,565,870.89 |

144.    Two days later, on November 16, 2016, the full extent of the Company's reliance on Medicare and Medicaid reimbursements for Acthar came to light when Citron published a report accusing the Company and Defendant Trudeau of securities fraud in connection with Trudeau's representations – made during the Company's October 6, 2015 conference call – regarding the percentage of Acthar sales for which Mallinckrodt received Medicare and Medicaid reimbursement.  The Citron Report utilized the recently released CMS data and compared it with the Company's reported sales of Acthar.  Based on that analysis, and contrary to Defendant Trudeau's representation in October 2015 that Acthar sales attributed to Medicare and Medicaid were "maybe a little higher" than 25% of the Company's total Acthar sales, the Citron Report presented that sales attributable to Medicare and Medicaid combined constituted 61% of Mallinckrodt's overall sales.  The report, which was captioned, "Mallinckrodt CEO FRAUD exposed by the new Medicare Drug Dashboard," began as follows:

> Mallinckrodt CEO Mark Trudeau has been caught red handed committing securities fraud -- exposed by none other than the newly released Medicare drugspending dashboard.

> This long-promised, just released public information database demonstrates that HP Acthar Gel is The Single Most Expensive Drug per Treatment as reimbursed by Medicare / Medicaid.

145.    The Citron Report continued by noting that in response to "public outcry and pressure to search for systemic reimbursement abusers" which, according to Citron, had reached a tipping point in October 2015 with the collapse of Valeant Pharmaceuticals, the CMS had

started to work on an online drug spending dashboard by December 2015 and the results had just

been made public earlier in the week.  After quoting Trudeau's statement of October 6, 2015

about the proportion of Mallinckrodt's business "that goes through Medicare and Medicaid

combined," the Citron Report stated:

> As we now learn, the concentration for Acthar paid by Medicare has ballooned to 61% as Trudeau lied to Wall Street.
>
> At the time, Trudeau must have calculated the investing public would never know the damning truth, but only two months later in response to public outrage, this information was on its way to being revealed to the public.
>
> For the year 2015, Medicare and Medicaid Spending is not merely "a little bit" higher than 25%.  In fact, it is over 61% of Acthar sales.

146.    The Citron Report included the following chart detailing Acthar spending by

Medicare and Medicaid over the years 2011 through 2015, which showed that the percentage of

Acthar sales that were reimbursed by Medicare and Medicaid was significantly higher than 25%

in each of the years since Mallinckrodt had acquired Questcor, coming in at 45.  51% in 2013,

60.  20% in 2014 and at 61.  32% in 2015.

**H.P.  Acthar CMS Spending**

| (in millions) | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|
| H.P. Acthar Spending by Medicare (CMS) | $49.457 | $141.452 | $262.582 | $391.190 | $503.999 |
| y/y growth | | 186.01% | 85.63% | 48.98% | 28.84% |
| | | | | | |
| H.P. Acthar Spending by Medicaid (CMS) | $40.007 | $57.410 | $83.939 | $126.837 | $144.566 |
| y/y growth | | 43.50% | 46.21% | 51.11% | 13.98% |
| **Total H.P. Acthar spending combined (CMS)** | **$89.464** | **$198.861** | **$346.520** | **$518.027** | **$648.565** |
| y/y growth | | 122.28% | 74.25% | 49.49% | 25.20% |
| | | | | | |
| **% of Acthar Revenue by CMS** | **41.01%** | **39.05%** | **45.51%** | **60.20%** | **61.32%** |
| **Calculated cost per beneficiary by Medicare** | **$57,980** | **$89,357** | **$108,014** | **$133,421** | **$162,371** |
| y/y growth | | 54.12% | 20.88% | 23.52% | 21.70% |
| | | | | | |
| **Calculated cost per beneficiary by Medicaid** | **$41,458** | **$44,060** | **$41,533** | **$45,331** | **$44,102** |
| y/y growth | | | | | |
| | | | | | |
| **Combined calculated cost** | **$49,210** | **$68,906** | **$77,835** | **$90,406** | **$101,624** |

147.    The Citron Report further indicated that Acthar constituted a more significant portion of the Company's business than had been disclosed previously.  Specifically, the Citron Report stated: "Let's not forget that Acthar continues to represent a massively disproportionate chunk of Mallinckrodt's bottom line a number that Trudeau is happy to dance around, rather than

disclose the true concentration of risk it took on when it levered up massively to acquire this never-proven drug."

148.    Following the release of the Citron Report, the price of the Company's stock fell 18.4%, from a closing price of $67.80 on November 15, 2016, to a closing price of $55.32 on November 17, 2016.  This drop wiped out $1.31 billion in Mallinckrodt's market capitalization.

149.    On November 17, 2016, the day after the Citron Report was issued, Mallinckrodt participated in the Jefferies London Healthcare Conference, at which Coleman Lannum, the Company's Senior Vice President, Investor Strategy and IRO, and Daniel Speciale, Director, Investor Relations, spoke and presented slides.   Although the Company's investor relations executives brought and discussed a series of slides that were presented at the Conference, including a slide showing comparisons of Acthar net sales between quarters in calendar years 2014 vs.  2013, 2015 vs. 2014, and 2016 vs. 2015, ***not a single slide was presented that contradicted the percentages of Acthar revenues paid through Medicare and Medicaid during the years 2013 (45.51%), 2014 (60.20%) and 2015 (61 32%) that had been included in the Citron Report***.  Nor did Lannum or Speciale provide any such precise figures relating to the Company's Acthar sales, which Lannum noted was "our largest single product."

150.    Following Lannum's presentation, and after reference by the moderator to the Citron Report ("there was a report out yesterday basically questioning the level of reimbursement for Acthar"), Lannum was asked, "can you disclose what percentage of Acthar sales are collectively, at this point, reimbursed by Medicare and Medicaid?" Lannum responded:

> So if you take a look at our core exposure of Acthar for ***Medicare, it's somewhere in the mid-40s percent range***.  If you take it to ***Medicaid, it's probably in the mid-single digit range.  Similar numbers last year***, if you go back two years, these are – by the way, these are all fiscal year numbers – we're on a September fiscal year – if you go back a couple of years, the exposure's a lot lower in

Medicare.  It's probably in the mid-30s.  Again, with a mid-single digit, maybe a little bit higher kind of Medicaid impact.

151.    These figures, of course, are significantly higher than the 25%, or "maybe a little higher," that Trudeau provided to investors in October 2015 for the percentage of Acthar sales that were going through Medicare and Medicaid combined – thereby representing an admission that the prior figures were absolutely and objectively false.  Further, Lannum couched his answer to this question – which he and the entire senior management team at Mallinckrodt must have known would be posed at the Conference – in very loose terms, saying the Medicare figures were "somewhere" within a mid-40s range and Medicaid payments were "probably" in the midsingle digit range.  But he further admitted that the same figures held for the year before, i.e., when Trudeau presented his answer on October 6, 2015.  Thus, even taking Lannum's statements at face value, they reveal that Trudeau's 25% or "maybe a little higher" representation of the Company's combined Medicare and Medicaid sales as a percentage of total Acthar sales was materially and significantly understated, as shown by Lannum's admission that the figures were in the "mid-40s range" plus in the "mid-single digit range," ***which add up to the low-50s percent range***.

152.    Lannum sought to explain the growth in the percentage of Acthar sales through Medicare by saying that a lot of the product's growth had come in the rheumatology and the pulmonology areas, and that with diseases like rheumatoid arthritis or sarcoidosis, "you tend to get a much older patient population." Due to this, "because those areas are growing for us very, very quickly, we've had a lot more exposure to Medicare over that period of time." He further sought to explain the discrepancies by stating that because of the natures of the diseases being treated, "you're talking about a relatively low number of patients here," and because of the "wide degree of indications that the product has, you get different growth rates in different product

areas, some of which will be very oriented towards commercial pay and some of which will be oriented towards the government pay side." But, of course, he nonetheless admitted that the ranges that he was providing at the Conference as Medicare and Medicaid percentages of total Acthar sales in November 2016 had "*[s]imilar numbers last year*," which means that they were at least in the low-50s percent range when Trudeau said they were 25% or "maybe a little higher than that."

153.    On November 29, 2016, before the market opened, Mallinckrodt released results for its fourth fiscal quarter 2016 ended September 30, 2016, and hosted an investor call.  Present on the call for the Company were Defendants Trudeau, Harbaugh, and O'Neill, as well as CSO Romano and Lannum.  During the call, Trudeau stated that the Company's Acthar's sales had proceeded to grow and that the Company had seen "continued growth particularly in rheumatology, pulmonology and nephrology." He also stated: "Infantile spasms, intensified efforts to ensure that infants afflicted with this condition have access to Acthar brought consistent market share gains across the past several quarters." He further stated that as the Company expanded access in pulmonology and rheumatology, "our patient mix has shifted more toward older patients, many of whom are covered by Medicare."

154.    Chris Schott, an analyst from JP Morgan, questioned the Company's product concentration, to which Defendant Trudeau responded: "So while our long-term objective is to have no single product account for more than a third of our operating income, currently our concentration has increased a bit.  ***And certainly Acthar now represents a significantly greater proportion of our operating income than a third***."  In responding to this question, Defendant Trudeau did not provide any actual percentages of the portion of Acthar sales that went through Medicare and Medicaid.  Nor did Trudeau contradict the percentages in the Citron Report.

155.    Defendant Trudeau further sought to explain, in response to another question about historical penetration levels, as follows: "this business, when we took it on a couple of years ago, was predominantly a neurology business and now it's starting to evolve much more into a pulmonology and rheumatology business."   But Trudeau's statement is belied by Mallinckrodt's Investor Briefing dated October 14, 2014, which, at slide 18, shows approximately the same Acthar Net Revenue in fiscal year 2014 from Neurology, Nephrology, and Rheumatology.  It is true that Rheumatology shows a more significant increase, but to say the business was "predominantly a neurology business" was a further misleading statement, which Trudeau apparently made to provide cover for his clearly materially false statement of October 6, 2015.

156.    Near the end of the earnings call, Defendant Trudeau sought to clarify that:

[h]istorically the business has been partitioned roughly 30% in neurology, 30% rheumatology, 30% nephrology, and then the balance everything else, predominantly pulmonology.  What we can clearly see is the percentages are growing for rheumatology, so now it's higher than 30%.  The percentage of neurology is actually declining a bit and nephrology is roughly holding static, and we're seeing growth also occurring in the pulmonology business.  So, that kind of gives you some perspective on the mix of business.

157.    However, this doesn't explain why Trudeau's statement made just one year prior, on October 6, 2015, that the level of Acthar sales that were paid by Medicare and Medicaid combined was 25% or "maybe a little higher" was so wrong for each of the years 2013, 2014 and 2015, as shown through a comparison of the CMS data first made public on November 14, 2016, and the Company's historical reported results.

158.    The disclosures made by Mallinckrodt and its executives on November 29, 2016 caused the Company's stock price to drop 9.1% from a close of $57.67 per share on November

28, 2016 to a close of $52.42 per share on November 29, 2016.  This drop wiped out an additional $550 million in Mallinckrodt's market capitalization.

159.    The following day, on November 30, 2016, Defendants Harbaugh and O'Neill, and CSO Romano participated at a Piper Jaffray Healthcare Conference.    During this Conference, Defendants continued to seek to explain away the falsity of Defendant Trudeau's October 6, 2015 statements regarding Mallinckrodt's Medicare and Medicaid exposure.  At that conference, O'Neill stated: "Our portfolio has shifted a little bit into the mid-40s as it relates to Medicare reimbursement for the product versus where it was a year and a half, two years ago which was more in that low, mid-30s." What O'Neill did not answer was why Defendant Trudeau – while responding to a question about Medicare reimbursements – affirmatively and intentionally presented data for combined Medicare and Medicaid reimbursements, and then misrepresented as "maybe a little higher" than 25% the combined reimbursement percentage when, in the years 2014 and 2015, the actual figures were over 60% and over 61% according to the Citron Report of November 16, 2016, and in the low 50's percent range as admitted by Coleman Lannum, the head of Mallinckrodt Investor Relations, on November 17, 2016.

> **4.    Defendants' Statements During 2017 Concerning Acthar's Claimed Growth Across Payer Mix, Strengthened Formulary Positions, Removal or Relaxation of Formulary Restrictions, Expansion in Commercial Lives Under Contract and Guidance Were False or Materially Misleading**

160.    Even after the revelations concerning the true extent of Acthar sales that were reimbursed by Medicare and Medicaid compared to private insurers and the settlement with the FTC, Defendants continued to make statements that misled the market with respect to the longterm prospects for the Company's Acthar sales and served to maintain Mallinckrodt's stock price at artificially inflated levels.   These included statements concerning Acthar's claimed

growth across the payer mix, strengthened formulary positions, removal or relaxation of previous formulary restrictions, expansion in terms of the number of commercial lives under contract, and guidance throughout this time period for mid-single digit to low double digit growth in net Acthar sales.

161.    On January 19, 2017, the day after the FTC settlement was announced, Defendant Trudeau, Investor Relations head Coleman Lannum and CSO Steven Romano participated in a "Business Update Call" with analysts.  Defendant Trudeau described the settlement with the FTC as merely "another step forward in our overall overhang de-risking process" stemming from Mallinckrodt's acquisition of Questcor, as was the earlier settlement of the antitrust claims asserted by Retrophin, and said that the FTC settlement did nothing to change the competitive environment for Acthar.  Indeed, after noting that the FTC settlement provided for a licensing of Synacthen for infantile spasms and nephrotic syndrome, Romano said that Mallinckrodt had never considered the development of Synacthen for those purposes, and Lannum said the Company ascribed "zero value" to those assets.  (This was, of course, inconsistent with the valuation that Questcor, which Mallinckrodt acquired for $5.6 billion in cash and stock and now was a subsidiary of Mallinckrodt, placed on Synacthen when it outbid at least three other potential acquirers to obtain the U.S. development rights to Synacthen, thereby eliminating the risk that someone would develop Synacthen as a competing drug to Acthar.) Defendant Trudeau added in this regard that Mallinckrodt continued to see Acthar "as an exceptionally durable asset" and reiterated the Company's belief that "we will be able to consistently drive mid single digit to low double-digit growth based predominantly on volume."[21]

---

[21] Accessible at: http://www.media-server.com/m/acs/13bb9558a227350d4f59c9fb6f60da8e.

162.    On February 7, 2017, Defendants reiterated this guidance in a press release filed as an exhibit to a Form 8-K and during an Earnings Call that (a) reported on the Company's results for the transition period from October 1, 2016 to December 30, 2016, and (b) provided guidance for the year 2017.  The press release reported that Acthar net sales were $325.4 million, a 13.5% increase over net Acthar sales of $286.7 million in the comparable quarter in 2015.  The Company further gave guidance for the upcoming 52-week calendar year, which it contrasted with the prior 53-week fiscal year.  The Company projected adjusted diluted earnings per share of $7.40 to $8.00 per share, and an increase of 4% to 7% for the net sales of the Specialty Brands segment (the segment that markets Acthar).

163.    During the earnings call the same day,[22] Defendant Trudeau addressed the FTC settlement, stating: "Although we strongly disagree with the allegations outlined in the FTC's complaint, this resolution removes the long-term distraction and overhang of litigation and allows us to more fully concentrate on growing and expanding our business." He stated that since acquiring Acthar, the Company had "consistently focused on two things to create long-term sustainable value.  First, expand access and reach to appropriate patients, and second work deliberately and systematically to resolve overhanging legacy issued we inherited when we acquired the drug." He represented that the Company had made "great progress in both areas."

164.    Defendant Trudeau further stated during the call that with these efforts, "we've also seen growth in Acthar in the mid single-digit to low double-digit range driven predominantly from volume increases in both commercial and public payer plan. … We expect these trends to continue." And, in response to an analyst question about the Acthar payer mix, Defendant Trudeau stated:

[22] Accessible at: https://www.nasdaq.com/aspx/calltranscript.aspx?StoryId=4043430&Title= mallinckrodt-plc-mnk-q5-2016-results-earnings-call-transcript.

165.    On May 8, 2017, the Company reported its results for the first quarter 2017.  The Company reported that Acthar net sales were $271.8 million, a 9.4% increase over $248.4 million in the comparable quarter in 2016.  Commenting on the Acthar sales, Defendant Trudeau was quoted in the press release as stating: "Notably, we continue to see strengthening in Acthar formulary positions and access for appropriate patients in both the commercial and public environments, including relaxation or removal of previous formulary restrictions and, in at least one case, addition of Acthar to a formulary for the first time." Commenting further during the earnings call the same day, Trudeau stated that "we continue to strengthen formulary positions and access to Acthar," including actions "relaxing or removing previous formulary restrictions."[23] He continued: "We're pleased with the ongoing progress and further stabilization we're achieving within the payer landscape and believe the high unmet medical need and low market penetration in most indications will support increased demand growth for Acthar."

166.    Trudeau represented that the Company was still achieving 60% commercial lives under contract for Acthar, which further was said to give Mallinckrodt "good confidence that we can continue to drive the long-term growth rate expectations in the mid-single to low doubledigit range."[24] Defendant Harbaugh added that the Company's rebating strategy "was fully considered

---

[23]    Accessible    at:    https://seekingalpha.com/article/4070664-mallinckrodt-plc-mnk-q1-2017-resultsearnings-call-transcript.

[24] Shortly after Mallinckrodt acquired Questcor, the Company began a project that had a "long-term objective" to bring the majority of "covered lives" under contract in order to solidify Acthar's reimbursement from private insurers. In the Company's earnings call of February 2, 2016, Defendant Trudeau stated that Acthar's commercial coverage "stands at about a third of the total eligible US patient population under contract with key payers and we continue to focus on expanding coverage with other major payers." He further stated "we're pleased with the progress we're making in managed care with regards to access" and that "we continue to make progress and continue to have a very good dialogue with managed care." During the earnings call of August 2, 2016, Trudeau again addressed this "long-term objective" and stated that "over the course of the last two years or so, we have moved that [the proportion of covered lives under

in the guidance that we provided." Finally, Lannum reiterated that: "All the ranges that we gave on the last call in February remain unchanged at this time."

167.   On May 19, June 6 and June 22, 2017, Mallinckrodt issued press releases in response to reports issued by short-sellers.  In these releases, among other things, the Company stated that Acthar's efficacy in its approved indications was strongly supported by evidence; that the Company had expanded the number of commercial lives under contract from zero to nearly 60%; and that in the commercial reimbursement space, "the majority of payers have an established pathway for the use of H.P. Acthar Gel in those patients for whom it is appropriately prescribed – those with conditions covered by the FDA-approval label and for whom the product's extensive existing data and clinical experience support H.P. Acthar Gel's use as a proven therapy." The Company further represented that the "prior-authorization and reimbursement processes used by commercial payers rely on these criteria, and are not bypassed through co-pay programs."

168.   On August 8, 2017, the Company announced its results for the second quarter ended June 30, 2017 in a press release and hosted a call with analysts the same day.  In the press release, the Company reiterated its EPS guidance at $7.40 to $8.00 notwithstanding that net sales were down 4.9% to $824.5 million in the quarter compared to the same quarter in 2016, and that adjusted diluted EPS in the quarter were $1.85 compared to $2.03 in the same quarter in 2016. The Company further reported that Acthar net sales were $319.4 million in the second quarter period, a 7.1% increase over $298.3 million in the same quarter in 2016.

---

contract for Acthar] from zero to now greater than 50%." In making these statements, and others in the year 2017, Trudeau sought to assure analysts and investors that the Company was moving in a positive direction to obtain significant increases in reimbursement payments for Acthar from private insurers.

169.    On the earnings call that day, Defendant Trudeau stated that Acthar's 7.0% growth during the quarter was "within our long-term range of mid-single to low double digits," noting that while increased price was the "driver" during the second quarter, the Company's expectations "longer term are that growth will be predominantly volume-driven, and we expect to see that in the back half of the year." He further stated: "we've been building on the strengthening formulary positions we've reported in the first quarter and are pleased to see that new patient prescriptions have reached their highest point in the last 12 months across the majority of promoted indications as we reach a broadening base of prescribers with additional data." Trudeau added in response to an analyst question concerning Acthar: "In terms of the growth, we would expect kind of similar type growth rates regardless of the payer mix, whether it's federal reimbursed patients, Medicare primarily or commercial patients, we would expect similar growth rates regardless of the type of reimbursement that occurs." He further said: "we continue to see good, strong formulary positioning, strengthening formulary positions that we alluded to in the first quarter," and that with the new data the Company had published on Acthar, "we wouldn't expect anything different here going forward."[25]

170.    Defendants' 2017 above statements omitted key information and, thus, misled the market into believing that as Acthar prescription levels increased, so too would its net sales. First, Defendants' claims during 2017 that Acthar's efficacy in its approved indications was strongly supported by evidence was highly misleading.  As the authors of the seminal report published in a leading medical publication, the Journal of the American Medical Association

---

[25] Saying that Mallinckrodt had strengthened Acthar's formulary position conveyed to the market that Acthar was being included in more insurers' formularies of approved medications under their plans and that insurers had expanded the circumstances (for instance, for treatment indications and for the duration of treatments) under which they would approve and provide reimbursement for Acthar.

("JAMA"), wrote in reply to a letter from Mallinckrodt's Chief Medical Officer, while Acthar has been found to be effective for infantile spasms and to treat relapses of multiple sclerosis, "the remainder of studies, as summarized in the review cited by Dr.  Otulana, are of low quality, consisting primarily of case series, small uncontrolled single-arm studies, and several observational studies of health care utilization."[26] As a result, they wrote: "Given the preponderance of small and uncontrolled single-arm studies, we have serious doubts that these studies will provide scientific evidence sufficient to justify use of Acthar at its current price."

171.   Second, Defendants' consistent invocations of increased percentages of commercial lives under contract, that "the majority of payers have an established pathway" for the use of Acthar in patients for whom it is appropriately prescribed for conditions covered by the FDA-approval label, and the Company's often repeated anticipated "mid-single to low double digits" Acthar growth rates, were highly misleading since many private insurers – throughout 2017 – had approved reimbursement for Acthar for only a few of its indications.  For instance, Aetna's Clinical Policy Bulletin ("CPB") for Repository Corticotrophin Injection (Acthar) had stated on August 8, 2008, that Acthar was "considered medically necessary for diagnostic testing of adrenocortical function, West syndrome (infantile spasms), and any of the FDA approved indications for repository corticotrophin after the patient has failed corticosteroid

---

[26] This constituted a serious critique of Mallinckrodt's data.   An arm of a study is a group of patients receiving a particular treatment (or no treatment at all).   A single arm study is one in which all of the patients receive the same treatment; there is no control or other experimental group.   This is distinguished from a two-arm randomized trial, in which patients are randomly assigned to two different groups: one group to receive the drug being tested, and a second group to receive an alternative treatment or a placebo, in order to compare their medical outcomes. Single arm studies are typically used in phase II of clinical trials, whose main objective is to determine whether a new treatment warrants further testing in a randomized phase III trial. Similarly, there is no randomized study of different treatments in observational studies or case series.

therapy."[27] Over the years, however, the CPB was revised to state that Acthar was considered: "not medically necessary for diagnostic testing of adrenocortical function" and "not medically necessary for corticosteroid-responsive conditions because it has not been proven to be more effective than corticosteroids for these indications" (Sept.  14, 2012);[28] "experimental and investigational for dermatopolymyositis, nephrotic syndrome (including focal segmental glomerulo-sclerosis, idiopathic membranous nephropathy, IgA nephropathy, membranoproliferative glomerulo-nephritis, and monoclonal diffuse proliferative glomerulo-nephritis), and systemic lupus erythematosus" (Dec.  9, 2014);[29] "experimental and investigational for amyotrophic lateral sclerosis, multiple sclerosis, optic neuritis, and rheumatoid arthritis" (Nov.  20, 2015);[30] and "experimental and investigational for birdshot choroiditis, pulmonary sarcoidosis, neurosarcoidosis, and uveitis (including panuveitis and posterior uveitis)" (Nov.  3, 2017).[31]

172.    Similarly, Cigna's coverage policies provide that while Acthar is considered to be "medically necessary" for treatment of infantile spasms in an individual less than 2 years old, it

---

[27] Accessible at: http://www.aetna.com/cpb/medical/data/700_799/0762.html.

[28] Accessible at: http://www.aetna.com/cpb/medical/data/disclaimer/review/700_799/0762_5.html.

[29] Accessible at: http://www.aetna.com/cpb/medical/data/disclaimer/review/700_799/0762_9.html.

[30] Accessible at: http://www.aetna.com/cpb/medical/data/disclaimer/review/700_799/0762_11.html.

[31] Accessible at: http://www.aetna.com/cpb/medical/data/disclaimer/review/700_799/0762_15.html.

is considered to be "not medically necessary for all other indications."[32] Cigna's coverage policies further states:

> Current evidence does not support any definitive benefit to the use of H. P Acthar Gel over conventional corticosteroids and/or immunosuppressive therapy (including prednisone and methylprednisolone) for FDA approved indications other than treatment of infantile myoclonic seizures. H. P. Acthar Gel is clinically equivalent but not superior to conventional corticosterois and/or immunosuppressive therapy for the treatment of multiple sclerosis, rheumatic disorders, collagen diseases, dermatologic disorders, allergic states, ophthalmic diseases, respiratory diseases, or edematous states, and is significantly more expensive. Coverage for H.P. Acthar Gel may therefore depend upon the applicable health benefit plan definition of medical necessity. Where that definition limits coverage to the most cost-effective equivalent treatment, the use of H.P. Acthar Gel for indications other than infantile myoclonic seizures is considered not medically necessary.

173.    Similarly, United Healthcare's policy with respect to Acthar, which was revised on September 1, 2017 and remains in place today, states that while Acthar is "proven and medically necessary" for the treatment of infantile spasm for up to 4 weeks when its enumerated criteria are met and for the treatment of opsoclonus-myoclonus syndrome (i.e., OMS, Kinsbourne Syndrome) when its enumerated criteria are met, and may also be covered for nonmedical necessity plans for the treatment of acute exacerbation of multiple sclerosis, it is "unproven and not medically necessary" for treatment of the following disorders and diseases: rheumatic disorders (psoriatic arthritis, rheumatoid arthritis, including juvenile rheumatoid arthritis, ankylosing spondylitis); collagen diseases (systemic lupus erythematosus, systemic dermatomyositis (polymyositis)); dermatologic diseases (severe erythema multiforme, StevensJohnson syndrome); allergic states (serum sickness); ophthalmic diseases (severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa, such as keratitis, iritis, iridocyclitis, diffuse posterior uveitis and choroiditis, optic neuritis,

---

[32] Accessible at: https://cignaforhcp.cigna.com/public/content/pdf/coveragePolicies/pharmacy/ ph_8001_coveragepositionc riteria_acthar.pdf.

chorioretinitis, anterior segment inflammation); respiratory diseases (symptomatic sarcoidosis); edematous state (to induce a diuresis or a remission of proteinuria in the nephrotic syndrome without uremia of the idiopathic type or that due to lupus erythematosus); and any indication outside of the proven indications above.[33]

174.    Many Blue Cross Blue Shield entities had similarly not expanded their approvals for Acthar treatments beyond a few indications.  For example, Independence Blue Cross Blue Shield, which serves Southeastern Pennsylvania, adopted a policy that had become effective November 25, 2014, and has remained in place, under which it will only approve the use of Acthar to treat infantile spasms in individuals age 2 or younger, and will not approve requests for Acthar for uses such as, but not limited to: multiple sclerosis; rheumatic disorders (e.g., psoriatic arthritis, rheumatoid arthritis, juvenile rheumatoid arthritis, ankylosing spondylitis); collagen diseases (e.g., systemic lupus erythematosus, systemic dermatomyositis [polymyositis]); dermatologic disease (e.g., severe erythema multiforme, Stevens-Johnson syndrome); allergic states (e.g., serum sickness); ophthalmic diseases (e.g., keratitis, iritis, iridocyclitis, diffuse posterior uveitis, choroiditis, optic neuritis, chorioretinitis, anterior segment inflammation); respiratory conditions (e.g., symptomatic sarcoidosis); to induce a diuresis or a remission of proteinuria in nephrotic syndrome without uremia of the idiopathic type or due to lupus erythematosus; corticosteroid-responsive conditions; or diagnostic testing for adrenocortical function.[34]

---

[33] Accessible at: https://www.uhcprovider.com/content/dam/provider/docs/public/policies/ comm-medicaldrug/repository-corticotropin-injection-hp-acthar-gel.pdf.

[34] Accessible at: http://provcomm.ibx.com/ProvComm/ProvComm.nsf/afe9b349fb4d82ef852579 12006dc3f7/418febd7be2 350ab85257d6400654e43!OpenDocument

175.    Thus, notwithstanding Defendants' representations about Acthar having gained greater access to insurance coverage for private managed care, the reality was that many major insurers were continuing to approve Acthar only for a limited range of treatments, and others were continuing to place severe restrictions on the duration of Acthar treatments, both of which created an undisclosed risk that a substantial portion of the prescriptions written for Acthar would never be filled and Acthar sales could decline.   The Defendants' statements about improved access to private insured lives were, for these reasons, false and/or materially misleading.

176.    The falsity of Defendants' statements in this regard came to light when, on November 7, 2017, the Company reported for the first time in its history that net sales of Acthar in the quarter had declined from the net sales in the comparable quarter in the prior year. Specifically, the Company disclosed that its net sales of Acthar in the third quarter ended September 29, 2017 were $308.7 million, down by 5.6% from net sales of $327.0 million during the same quarter in 2016.  Mallinckrodt 3Q2017 Form 10-Q, at 35.  The $308.7 million in third quarter 2017 Acthar net sales also missed analysts' consensus estimate of $326.6 million. Reuters, "*Mallinckrodt slumps as Acthar drug sales disappoint*," Nov.  7, 2017, 8:38 a.m.

177.    During the third quarter 2017 earnings call held on November 7, 2017[35] Defendant Trudeau said that "Acthar sales growth slowed in the quarter impacted by both the comparison against 2016 with an additional selling week *and a volume decline*." He attributed the volume decline to the fact that "as the third quarter progressed, we saw *an increasing number of prescriptions going unfilled* beyond the level we had seen previously," which the Company anticipated would take time to work through, leading to the expectation that fourth

---

[35] Accessible at: https://www.nasdaq.com/aspx/calltranscript.aspx?StoryId=4121687&Title= mallinckrodt-plc-mnk-q3-2017-results-earnings-calltranscript.

quarter 2017 Acthar net sales would also be down sequentially and that the Company would thereafter provide guidance for the year 2018.  In responding to one of the many analyst questions concerning the Company's Acthar sales, *Trudeau admitted that Acthar "continues to experience payer pressures" and "we expect those payer pressures to continue to be more challenging.  We expect payers to put more and more hurdles in front of patients getting reimbursement*…. The situation that we're experiencing now is this combination of both those payer pressures, plus … the additional issue that we're seeing with these patient prescriptions going unfilled at this point."

178.    The decline in Acthar sales in the third quarter 2017 from the comparable quarter in 2016 was no fluke.  In fact, confirming the private payer issues facing the Company and that were materially misrepresented during the Relevant Period, declining sales have continued into the fourth quarter 2017 and the first quarter 2018.  Net Acthar sales of $295.2 million in the fourth quarter 2017 (ended December 29, 2017) represented a 9.3% decline from net sales of $325.4 million in the fourth quarter 2016.  And net Acthar sales of $243.8 in the first quarter 2018 (ended March 30, 2018) represented a 10.3% drop from net sales of $271.8 million in the first quarter 2017.

### E.    The Truth About Mallinckrodt Is Revealed Over Time

179.    On August 4, 2015, Mallinckrodt reported financial results for the quarter ended June 26, 2015.  Mallinckrodt not only reported revenue that was well below analyst expectations, but it disclosed that Acthar's sales growth would be much lower than expected going forward. During a conference call on that same day, Defendant Trudeau highlighted the fact that the Company was facing a great deal of pressure from health insurance companies and other payers

over the cost of Acthar and warned that a string of consolidation in the health insurance industry

could make the situation even more difficult. Defendant Trudeau stated:

> Yeah. So, first of all, let me say that we're quite pleased with our performance for Acthar in the quarter, $269 million for the quarter, that's an all-time record quarter for the product. And we're pleased that we're continuing to be able to drive growth, particularly given the fact that last year's third quarter was a particularly strong quarter when it was in the previous owner's hands.

> We're very encouraged by the promotional effort behind Acthar, but one of the things we are experiencing certainly is a more difficult payer environment certainly then was the case a year ago. And that's really what's changing our perspective with regards to the long-term prospects of Acthar. As I mentioned earlier, we anticipate long term that Acthar will be growing in the mid-single to low-double-digit range over the next couple of years.

> We're very encouraged by the fact, though, that we're making now very good progress with payers. We're having, I think, very productive dialogue with payers and the rest of that is what we announced this morning, is that we've been put on at least one major payer's preferred drug list for Acthar which is a significant event for us. And we continue to have dialogue with a variety of additional payers, primarily around the database behind Acthar and the appropriate positioning of the product as it's used in its variety of indications in autoimmune and rare diseases.

180.    In response to further questioning as to whether "pressure from payers" was offset

by success in securing a spot on an insurer's preferred formulary. Defendant Trudeau stated in

part:

> [W]hat we see is the payer environment … is certainly eroded a bit from where we were a year ago. It's more difficult, we think, across the board, across the industry to get reimbursement on key products, and Acthar is no different.

> In the case of Acthar, of course, historically, there had been relatively little discussion at the payer policy level regarding the data set around Acthar and the proper positioning of the product. And I think in previous discussions, we had talked about the fact that we had initiated those discussions. And in fact, what we're seeing now, we believe, is the first fruits of those labors where we are getting put in a preferred drug list.

*       *       *

If I net all of these things out, I think that right now, the pressure from the payer environment is perhaps a little bit stronger than the progress that we've been able to make to this point.  But clearly, we're starting to push in the opposite direction.  And we would think over time those things would balance themselves out.  And I think that's why we're giving the direction of, well, how to think about Acthar in that the revenue growth rates are likely to be towards the lower end of our range for the next several quarters until we can make further progress on the payer environment which we believe will still take us a number of quarters to achieve.

181.   In reaction to the August 4, 2015 disclosures, the stock price of Mallinckrodt declined 14% or $17.48 per share, from a close of $124.21 on August 3, 2015 to a close of $106.73 on August 4, 2015.  However, the Defendants' statements made in the August 4, 2015 continued to be materially false and misleading.  Among other things, Defendant Trudeau's statement that "we're making now very good progress with payers" was false or, at the least, materially misleading, because as the CMS data would later show, the portion of Acthar sales that were being reimbursed through Medicare and Medicaid had consistently increased from 2013 (45%) to 2014 (60%) and to 2015 (61%).  His statement was similarly false and materially misleading because it omitted to state that the Company's projected growth in Acthar sales, in the mid-single to low-double-digit range over the next couple of years, was only possible because of the Company's violations of the antitrust laws and the actions it was taking to maintain the ACTH monopoly for Acthar in the U.S. market.

182.   Further corrective disclosures came primarily from sources outside the Company, but similarly led to significant market corrections of the Company's stock price.

183.   On November 9, 2015, Citron Research released a statement likening Mallinckrodt to Valeant Pharmaceuticals and summarized Mallinckrodt's history of price increases for Acthar.  The tweet specifically referenced the Company's reimbursement levels: "At these prices $MNK [Mallinckrodt] has signif more downside than $VRX [Valeant] -- far worse offender of the reimb[ursement] sys[tem] - more to follow.  VRX can't live in a vacuum."

By issuing this statement, Citron helped to disclose the magnitude of the wrongdoing by Mallinckrodt, and that it was even greater than the notorious benchmark provided by Valeant, which the market knew had already resulted in substantial harm to investors.  Following the issuance of the Citron tweet, the price of the Company's stock fell 17% from a close of $69.89 on November 6, 2015, to close at $58.01 on November 9, 2015.  The November 9, 2015 stock drop wiped out $1.25 billion in Mallinckrodt's market capitalization.[36]

184.    The next day, Defendant Trudeau appeared on CNBC to respond to Citron's allegations in an attempt to forestall a further decline Mallinckrodt's stock price.  On CNBC's "Squawk Box," Defendant Trudeau stated that "***the facts [Andrew Left] quoted were mostly, if not completely wrong***." He further said: "We also announced on our third quarter earnings call and confirmed on our guidance call that we are having very good success now in getting Acthar into favorable formulary positions … which should ensure the long-term stability of reimbursement for Acthar, which is what we are all about.  We are playing the long game with

---

[36] The significance of Citron's November 2015 negative disclosures concerning Mallinckrodt was highlighted in a February 29, 2016 letter from the SEC to Defendant Harbaugh, stating:

> We note recent media reports regarding the pricing of Acthar and the potential for increased scrutiny and government investigations regarding such pricing.   We also note the substantial decrease in your stock price in November 2015 in response to the negative publicity.   ***Please tell us what consideration you gave to disclosing the material risks to your company related to the public scrutiny of your Acthar pricing, including the material impact of any current or potential investigations or litigation.***

Mallinckrodt responded on March 11, 2016 with a publicly-filed letter to the SEC that was accessible to investors on the SEC's website.   Mallinckrodt's response disputed the assertions in the November 9, 2015 tweet by Andrew Left of Citron and asserted that the Company's discussion of certain risk factors in the 2014 Form 10-K filed on November 15, 2014, "sufficiently addressed the material risks associated with Acthar." This was a further false and misleading statement.

this product because it is very durable, it's very effective for a variety of different autoimmune conditions, and it is one that we think is going to continue to drive value for the company."[37]

185.     The above statements are materially false and/or misleading because they misrepresented and failed to disclose adverse facts pertaining to Mallinckrodt's business and operations which were known to or recklessly disregarded by Defendants.  Defendants failed to disclose that Mallinckrodt's sales of Acthar were dependent on illegal, anticompetitive conduct in preventing a competing synthetic version of ACTH from entering the U.S. market.  Moreover, although Defendant Trudeau chose to comment publicly on Andrew Left's comments about the reimbursement system for Acthar, Defendant Trudeau failed to disclose that, at the time, the Company was obtaining more than 60% of all payments for Acthar from Medicare and Medicaid, which Trudeau had stated on October 6, 2015 – just one month earlier – stood at 25% or "maybe a little higher."

186.     On March 15, 2016, Citron issued another statement on Twitter regarding the Company, noting that the market was beginning to realize that owning Mallinckrodt stock was as risky as owning Valeant.  Specifically, Left tweeted "Mkt.  is starting to realize that $MNK [Mallinckrodt] equal risk to $VRX [Valeant].  Andrew Left of @Citron on CNBC 5:30 to explain risks of the $MNK platform." Left then appeared on CNBC's Fast Money asserting that Mallinckrodt made Valeant look like a "choirboy," and stated that Mallinckrodt is worse than Valeant because it's "dependence on one drug, close to let's say 50 percent their EBITDA, depends on what metric you want to look at, is dependent on one particular drug.  Not let's say 30 like Valeant has.  Left also described Acthar as having "no real clinical testing" and as the "poster child" of price gouging.

---

[37] https://www.cnbc.com/2015/11/09/another-drug-stock-tanks-on-citron-short-threat.html.

187.    Defendant Trudeau dialed-in to *Fast Money* that day and attempted to rebut Left's statements, declaring: "First and foremost, Mallinckrodt is a well-diversified, strong company. We are transparent.  Our strength is both operational and financial." He further represented that "Acthar represents less than a third of [Mallinckrodt's] business, …" He reiterated that the Company has a "very strong, solid business model.  Well diversified with excellent brands."

188.    Notwithstanding Defendant Trudeau's statements in favor of the Company, shares of Mallinckrodt stock fell after the disclosures made by Left.  Mallinckrodt shares dropped 20% over a two-day period, from a close of $69.61 on March 14, 2016, to a close of $55.69 per share on March 16, 2016.  This two-day drop wiped out another almost $1.5 billion in Mallinckrodt's market capitalization.

189.    Moreover, Trudeau's comments still did not disclose the truth about the Company or its Acthar franchise.  Among other things, while Acthar's reported revenues may have been about one-third of the Company's total reported revenues, the Acthar franchise was responsible for far more than one-third of the Company's operating income.  An October 12, 2015 analyst report issued by J.P. Morgan had noted the importance of the Acthar franchise to Mallinckrodt, stating its conclusions that Acthar represented $1 billion in sales and about 50% of the Company's operating profit.  But, of course, that was only an opinion issued by an outside analyst.  And less than a year after Trudeau's comments in mid-March, on November 29, 2016, when Trudeau was responding to the CMS data and Citron Report issued on November 14 and 16, 2016, respectively, he ***admitted*** that substantially more than one-third of the Company's operating income derived from Acthar sales.  As Trudeau stated: "So while our long-term objective is to have no single product account for more than a third of our operating income,

currently our concentration has increased a bit and ***certainly Acthar now represents a significant greater proportion of our operating income than a third."***

190.    On November 14, 2016, as alleged above, the CMS released updated drug pricing data for 2015 indicating that Medicare spending on Acthar had increased from $391 million in 2014 to $648.5 million in 2015.  Two days later on November 16, 2016, as further alleged above, the full extent of the Company's reliance on Medicare and Medicaid reimbursements for Acthar came to light when Citron published a report accusing the Company and Defendant Trudeau of securities fraud in connection with Trudeau's representations regarding the percentage of Acthar sales for which Mallinckrodt received Medicare reimbursement were false on the Company's October 6, 2015 conference call, and showing that contrary to the representations that Acthar sales attributed to Medicare and Medicaid "maybe a little higher" than 25% of the Company's sales, they were actually over 60% and 61% in 2014 and 2015, respectively.  The Citron Report also highlighted the fact that Acthar represents a much more significant portion of the Company's business.  Specifically, the Citron Report noted "Let's not forget that Acthar continues to represent a massively disproportionate chunk of Mallinckrodt's bottom line a number that Trudeau is happy to dance around, rather than disclose the true concentration of risk it took on when it levered up massively to acquire this never-proven drug."

191.    Following the release of the Citron Report, the price of the Company's stock fell 18.4%, from a closing price of $67.80 on November 15, 2016, to a closing price of $55.32 on November 17, 2016.  This drop wiped out another $1.31 billion in Mallinckrodt's market capitalization.

192.    Then, on November 29, 2016, before the market opened, Mallinckrodt released results for its fourth quarter 2016 and hosted a quarterly call with analysts.  Chris Schott, an

analyst from JP Morgan, questioned the Company's product concentration, to which Defendant Trudeau responded: "So while our long-term objective is to have no single product account for more than a third of our operating income, currently our concentration has increased a bit and certainly ***Acthar now represents a significantly greater proportion of our operating income than a third***." Defendant Trudeau did not provide what proportion of Mallinckrodt's operating income Acthar actually represented, but this admission made clear that Defendant Trudeau's prior statement, on March 15, 2016, that Acthar represented less than one-third of the Company's business was false or, at the least, materially misleading.

193.    The news of the Company's actual reliance on Acthar for substantially more than one-third of its total operating income, along with other disclosures made that day, caused Mallinckrodt's stock price to drop 9.1% from a close of $57.67 per share on November 28, 2016 to a close of $52.42 per share on November 29, 2016.  This drop wiped out an additional $550 million in Mallinckrodt's market capitalization.

194.    Further, on January 18, 2017, as alleged above, the FTC and the States of Alaska, Maryland, New York, Texas and Washington filed a complaint against Mallinckrodt alleging that the Company violated antitrust laws when Questcor acquired the rights to Synacthen, a drug that threatened its monopoly in the U.S. market for ACTH drugs, and thereafter continued to charge monopoly prices for Acthar and suppress any development of Synacthen in the U.S. market for indications that would have competed with Acthar.  FTC Chairwoman Edith Ramirez stated "Questcor took advantage of its monopoly to repeatedly raise the price of Acthar, from $40 per vial in 2001 to more than $34,000 per vial today – an 85,000 percent increase.  We charge that, to maintain its monopoly pricing, it acquired the rights to its greatest competitive

threat, a synthetic version of Acthar, to forestall future competition.  This is precisely the kind of conduct the antitrust laws prohibit."

195.    Along with the filing of the FTC Complaint, the FTC also filed a Consent Decree in which Mallinckrodt agreed to pay $100 million to settle the claims alleged against the Company, which equated to 43% of Mallinckrodt's total operating income (before taxes) for its 2016 fiscal year.  In addition, as part of the settlement with the FTC, Mallinckrodt was required to agree to license Synacthen to a competitor who could then commercialize the drug in the U.S. for the treatment of Infantile Spasms and Nephrotic Syndrome.

196.    On this news of the filing of the Complaint and Consent Decree, the price of the Company's stock fell 5.85%, from a close of $49.42 on January 17 to a close of $46.53 on January 18, 2017.  This stock drop wiped out over $300 million in Company market capitalization.

197.    Finally, on November 7, 2017, as alleged above, the full truth about Mallinckrodt's Acthar product was revealed and the falsity of Defendants' statements made during 2017 concerning Acthar's claimed growth across the payer mix, strengthened formulary positions, removal or relaxation of previous formulary restrictions, expansion in terms of the number of commercial lives under contract, and guidance throughout this time period for midsingle digit to low double digit growth in net Acthar sales, came to light when the Company reported for the first time in its history that net sales of Acthar in the quarter had declined from the net sales in the comparable quarter in the prior year.  With the disclosures of November 7, 2017, the price of Mallinckrodt stock fell by 35.5%, falling by $11.07 per share from a closing price of $31.18 on November 6, 2017, to a closing price of $20.11 on November 7, 2017, on

enormous volume of over 34 million shares traded.  This stock drop wiped out $1.05 billion in the Company's market capitalization.

198.    As set forth herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, receipt and/or modification of Mallinckrodt's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Mallinckrodt, participated in the fraudulent scheme alleged herein.

199.    Defendant Trudeau was, at all times during the Relevant Period and continuing to the present, the CEO of the Company and a member of the management executive committee. As alleged in greater detail above, Defendant Trudeau made affirmative statements in press releases and presentations concerning the Company's business plans and operations, its competitive environment, its results and its future prospects, which included the Company's Acthar product that contributed approximately one-third of the Company's total revenues and substantially more than that of its operating income.  Defendant Trudeau further intentionally made affirmative statements about the Company's and Acthar's percentages of reimbursement combined from *Medicare and Medicaid* when he was asked only about Medicare, thereby presenting himself as knowledgeable about that subject.

200.    The Company's Board and management were provided with up-to-date information concerning its sales of Acthar.  This further corroborates that Trudeau's statement in October 2015 that the percentage of Acthar sales that were reimbursed by Medicare and Medicaid was "maybe a little higher" than 25% – when, in fact, the percentage of Acthar sales that were reimbursed by Medicare and Medicaid was actually much higher (60% and 61% in 2014 and 2015, respectively, according to the Citron Report, and at least 50% as belatedly

admitted by the head of Mallinckrodt's Investor Relations, Coleman Lannum) – was an intentional misstatement made by Trudeau.  The Company's culpability, and the culpability of each of its management team, is further evidenced by the fact that this significant misstatement was not corrected by Trudeau or by any other member of Mallinckrodt management either during the October 2015 conference or at any other time over the ensuing 13 months.  Rather, the truth about this material misstatement by Defendant Trudeau came to light only after the CMS reported on Medicare and Medicaid spending in the years 2011 through 2015 for 80 drugs (including Acthar) that met its reporting criteria, and when Citron Research issued its report of November 16, 2016.

201.    Upon information and belief, Defendant Trudeau and others within the Company's management and Board of Directors were similarly provided with historical and current formularies and restrictions on reimbursement for prescriptions written for Acthar, such as those noted above, which undercut Defendants' statements throughout the Relevant Period, including in 2017, concerning Acthar's claimed growth across the payer mix, strengthened formulary positions, removal or relaxation of previous formulary restrictions, and expansion in terms of the number of commercial lives under contract.  Defendants' knowledge of this, as well as criticisms of the medical studies underlying their claims that Acthar had been shown to be effective for all of its indications, similarly make clear that they did not have a reasonable basis for the guidance provided to the market in February 2017 and reiterated consistently thereafter until the Company's disclosures of the truth on November 7, 2017.

202.    As further alleged above, Defendants and other members of the Mallinckrodt Executive Committee ultimately made decisions about the development, or lack of development, of Synacthen in the United States market, as well as the decisions to enter into the settlements

reached with Retrophin in June 2015 (which included a $15.5 million payment to Retrophin) and with the FTC in January 2017 (which included a $100 million payment to the federal Government, and an agreement to sub-license Synacthen for development for the potential treatment of infantile spasms and nephrotic syndrome).

203.    Defendants Trudeau's and Harbaugh's knowledge concerning the alleged misrepresentations are also indicated by their signings of each of the Company's Forms 10-K and 10-Q during the Relevant Period.

204.    Defendant O'Neill was, at all times relevant, the President of the ARD division of Mallinckrodt, which encompassed Acthar from the time of the Questcor merger in August 2014 to the present.   Among other things, O'Neill made affirmative statements in September 2014 about the "due diligence" that Mallinckrodt had undertaken with respect to Acthar.   He further participated on many quarterly and other investor conferences during the Relevant Period and, as alleged above, was a key person in terms of setting policy and overseeing the Company's operations with respect to its Acthar franchise.   As a member of the management executive committee, he was also privy to the Company's plans for developing Synacthen in the United States only for treatments that would not compete with Acthar.

### F.    The Court in the Securities Class Action Denies in Part Defendants' Motion to Dismiss

205.    On July 30, 2019, the court in the Securities Class Action issued an order denying in part Defendants' motion to dismiss, finding that:

> the plaintiffs' have successfully stated a claim under Section 10(b) and Rule 10b–5 with respect to (1) the defendants' alleged failure to disclose the fact of an impending settlement with the FTC in Mallinckrodt's 2016 10-K; (2) Trudeau's alleged misstatement regarding Acthar's exposure to Medicare and Medicaid in October 2015; and (3) the defendants' alleged misstatements and omissions in 2017 regarding the long-term prospects for Acthar's sales as far as they relate to statements about (a) Acthar's growth across the payer mix, (b) strengthened

formulary positions and the removal or relaxation of formulary restrictions, and (c) specific growth projections.

## V.   DAMAGES TO THE COMPANY

206.    As a result of Defendants' wrongful conduct, Mallinckrodt disseminated false and misleading statements, and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Mallinckrodt's credibility. Mallinckrodt has been, and will continue to be, severely damaged and injured by Defendants' misconduct.

207.    As a direct and proximate result of Defendants' actions as alleged above, Mallinckrodt's market capitalization has been substantially damaged, having lost millions of dollars in value as a result of the conduct described herein.

208.    Further, as a direct and proximate result of Defendants' conduct, Mallinckrodt has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in investigating and defending Mallinckrodt and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b) costs incurred from compensation and benefits paid to Defendants, which compensation was based at least in part on Mallinckrodt's artificially inflated stock price; and

(c) costs incurred from the loss of the Company's customers' confidence in Mallinckrodt's products

209.    Moreover, these actions have irreparably damaged Mallinckrodt's corporate image and goodwill. For at least the foreseeable future, Mallinckrodt will suffer from what is

known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Mallinckrodt's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

210.    Plaintiff brings this action derivatively in the right and for the benefit of Mallinckrodt to redress injuries suffered, and to be suffered, by Mallinckrodt as a direct result of violations of federal securities laws by the Defendants.   Mallinckrodt is named as a Nominal Defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

211.    The Board of Mallinckrodt, at the time this action was commenced, consisted of Russell, Trudeau, Carlucci, Carroll, Carter, Norton, Paya, Reed, Whitaker, and Youngblood, a total of 10 individuals.

212.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Mallinckrodt Board would be futile, and therefore, excused.   This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

### Demand is Futile as to Defendant Trudeau Because His
### Principal Professional Occupation is as the Company's Chairman and CEO

213.    Defendant Trudeau has been the Company's president, CEO since June 2013.   In his role as CEO of the Company for the fiscal years 2017 and 2018, Defendant Trudeau received $15,026,710 and $14,044,012 in total compensation respectively.   The Company does not claim that Defendant Trudeau is an independent director and because Defendant Trudeau's primary source of income and primary employment is his employment as Chairman and CEO of

Mallinckrodt and his professional reputation is inextricably bound to his role at Mallinckrodt, Defendant Trudeau is incapable of acting independently and demand is futile upon him.

### Demand is Futile as to the Members of the Audit Committee

214.   Demand is futile as to Defendants Reed and Russell (collectively, the "Audit Committee Defendants") who served (and continue to serve) as members of the Audit Committee during the Relevant Period, as the Audit Committee Defendants knowingly failed to fulfill their responsibilities.[38]

215.   The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.   The Audit Committee Charter notes that the purpose of the Audit Committee shall be to assist the Board in overseeing the integrity of the Company's quarterly and annual financial statements, as well as the Company's financial accounting principles.  Specifically, the Audit Committee Charter notes that the Audit Committee is supposed to:

> Meet to review and discuss annual audited and quarterly unaudited financial statements, including 'Management's Discussion and Analysis of Financial Condition and Results of Operations' and other related disclosures or reports with management, the internal audit director, and the independent auditor, as appropriate, and recommend to the Board whether the audited financial statements and/or related disclosures or reports should be approved by the Board and included in the annual report on Form 10-K and/or any filings required by Irish law.

216.   Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that

---

[38] Defendants Reed and Russell have served on the Company's Audit Committee since at least August 2014.

the statements set forth above in the Company's public filings were materially false and misleading when made.

217.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the Company's Acthar drug.   In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.   Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

## Demand is Futile as to the Director Defendants

218.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.   This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

219.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

220.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC

throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

221.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## VIII.   CAUSES OF ACTION

## COUNT I

### Against the Officer Defendants for Contribution Under Section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act

222.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

223.    As a result of the conduct and events alleged above, Mallinckrodt has been named as a defendant in the Securities Class Action brought on behalf of Mallinckrodt shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

224.    Federal law provides Mallinckrodt with a cause of action against other alleged joint tortfeasors under Rule 10b-5. In particular, under the Supreme Court's decision in Musick, Peeler & Garrett v. Employers Insurance of Wausau, 508 U. S. 286, Mallinckrodt has a federal law right of contribution against joint tortfeasors under Rule 10b-5. Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Mallinckrodt to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been

named as defendants in the currently pending Securities Class Action, and sets forth specific rules regarding the determination of claims for such contribution.

225. Accordingly, Plaintiff, on behalf of Mallinckrodt, hereby claims contribution against the Officer Defendants, each of whom has been named in the currently pending Securities Class Action as a joint tortfeasor with Mallinckrodt under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Mallinckrodt.

226. Mallinckrodt claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Officer Defendants**

227. Throughout the Relevant Period, the Officer Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the long-term sustainability of the Company's monopolistic revenues from Acthar and the exposure of Acthar to Medicare and Medicaid. These statements were materially misleading to persons who purchased Mallinckrodt securities during the Relevant Period. In particular, the SEC filings and other public statements created the false impression that, inter alia,

228. Throughout the Relevant Period, the Officer Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the long-term sustainability of the Company's monopolistic revenues from Acthar and the exposure of Acthar to Medicare and Medicaid. These statements were materially misleading to persons who purchased Mallinckrodt securities during the Relevant Period. In particular, the SEC filings and other public statements created a false impression of (1) the Company's ability to preserve and exploit its monopoly position and

resulting profits, and artificially inflated the prices of Mallinckrodt's securities; and (2) the true extent of Acthar's reliance on Medicare and Medicaid by intentionally providing false data to the market in the fall of 2015 that Acthar was not as dependent on reimbursements from these programs as it actually was.

229.    The plaintiffs in the Securities Class Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Mallinckrodt securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

230.    The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

231.    The plaintiffs in the Securities Class Action were unaware of the false and misleading nature of said statements and omissive disclosures.

232.    When the Officer Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading. As alleged in detail herein, due to their positions as employees and/or directors of Mallinckrodt, the Officer Defendants were privy to information regarding the Company's financial prospects and internal controls, and would have been well aware the ongoing issues at the Company.

233.    Accordingly, the Officer Defendants are liable for damages under Section 10b of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Mallinckrodt were to be held

liable in the Securities Class Action, the Officer Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of Mallinckrodt.

### Allegations Regarding the Officer Defendants as Control Persons

234.    In acting as alleged above, the Officer Defendants were acting as authorized agents of Mallinckrodt in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Officer Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

235.    The Officer Defendants were "controlling persons" of Mallinckrodt within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Officer Defendants could be held liable to the plaintiffs in the Securities Class Action. Were the Company to be held liable in said Securities Class Action, the Officer Defendants would be liable to it for contribution.

### COUNT II

### Against all Defendants for Breaches of Fiduciary Duties

236.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

237.    Defendants owed and owe Mallinckrodt fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe Mallinckrodt the highest obligation of good faith, loyalty, and due care.

238.    Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Mallinckrodt shareholders materially misleading and inaccurate information through the Company's SEC

filings throughout the Relevant Period.   These actions could not have been a good faith exercise of prudent business judgment.

239.   During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Mallinckrodt to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Mallinckrodt and its shareholders.   As a result, Defendants grossly mismanaged the Company.

240.   As a direct and proximate result of their failure to perform their fiduciary obligations, the Company has sustained significant damages.   As a result of the misconduct alleged herein, Defendants are liable to the Company.

241.   Plaintiff, on behalf of Mallinckrodt, has no adequate remedy at law.

## COUNT III

### Against all Defendants for Unjust Enrichment

242.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

243.   By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Mallinckrodt.

244.   The Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Mallinckrodt.

245.   Plaintiff, as a shareholder and representative of Mallinckrodt, seeks restitution from the Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct and breaches of fiduciary duty.

246.     Plaintiff, on behalf of Mallinckrodt, has no adequate remedy at law.

## COUNT IV

### Against all Defendants for Abuse of Control

247.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

248.     Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Plaintiff and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the Company's Acthar drug product.

249.     As such, Defendants have abused their positions of control with the Company and are legally responsible.

250.     Thus, for the aforementioned reasons, Defendants are liable to the Company for their wrongdoing.

## COUNT V

### Against Defendants for Gross Mismanagement

251.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

252.     Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company.   Furthermore, the Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

253.    Through the wrongful acts complained of herein, Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

254.    By committing the misconduct alleged herein, Defendants, breached their fiduciary duties of due care, diligence and candor in the management and administration of Mallinckrodt's affairs and in the use and preservation of Mallinckrodt's assets.

255.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Mallinckrodt to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to Mallinckrodt, thus breaching their duties to the Company.

256.    As a result, Defendants grossly mismanaged Mallinckrodt and should be liable to the Company for the resulting damages.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

257.    Declaring that Plaintiff may maintain this action on behalf of Mallinckrodt and that this Plaintiff is an adequate representative of the Company;

258.    Determining and awarding to Mallinckrodt the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

259.    Directing Mallinckrodt and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Mallinckrodt and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the

following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

260.    Determining and awarding to Mallinckrodt exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

261.    Awarding Mallinckrodt restitution from defendants, and each of them;

262.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

263.    Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: September 17, 2019                    Respectfully submitted,

                                             **GOLDMAN & MINTON, P.C.**


                                             _____/S/_____
                                             Thomas J. Minton (No. 367124)
                                             3600 Clipper Mill Rd., Suite 201
                                             Baltimore, Maryland 21211
                                             Telephone: (410) 783-7575
                                             Facsimile: (410) 783-1711
                                             tminton@charmcitylegal.com

**OF COUNSEL:**

**LIFSHITZ & MILLER LLP**
Joshua M. Lifshitz
Email: jml@jlclasslaw.com
821 Franklin Ave, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376